ARTHUR K. BOURNE and Another, as Trustees, etc., of FREDERICK G. BOURNE, Deceased, Appellants, Respondents, *v.* ARTHUR K. BOURNE and Others, Defendants, Impleaded with MAY B. STRASSBURGER and Others, Respondents, Appellants.

First Department, May 16, 1924.

**Trusts — testamentary trusts — apportionment of stock dividends between beneficiaries and remaindermen — provision in will directing trustees to receive dividends and apply same to use of beneficiaries does not show intention that all dividends regardless of origin should be paid to beneficiaries — financial statements of corporation not absolutely binding in determining whether dividends represent income — losses in corporate assets were properly charged off after testator's death — stock dividends declared after testator's death represented profits accruing prior thereto and were properly added to corpus of estate.**

A provision in a will creating a trust of corporate stock which provides that the trustees shall receive the dividends and income therefrom and apply the same to the use of the beneficiaries, does not evidence an intention on the part of the testator that the trustees should receive all dividends and income of every nature regardless of its origin and pay the same to the beneficiaries.

In determining whether extraordinary stock dividends declared after the death of a testator are a part of the corpus of the trust estate, the courts are not bound absolutely by the financial statements of the corporation, and in an equitable action wherein it is sought to apportion stock dividends, in which it is necessary to determine whether or not the corpus of the trust is being encroached upon by the declaration and payment of the dividends, any fact relative to the issue may be taken into consideration and for that purpose the courts may go behind the financial statements of the corporation.

The corporation whose stock was held in trust had suffered severe losses in Russia, and a very large portion of its Russian assets had been charged off the books prior to the testator's death, but the corporation still carried on its books approximately $12,000,000 worth of assets in Russia. The contention of the beneficiaries that the remaining Russian assets were lost prior to the death of the testator and should have been charged off the books before that time is not supported by the evidence and, therefore, it cannot be held that the stock dividends declared after the testator's death represented any part of the profits accruing thereafter, but it must be held that the trustees had the right to allocate the stock dividends to the capital of the trust fund and this conclusion is

supported by the proof that the cash dividends actually paid after the testator's death were nearly twice the amount of the actual net income of the corporation during that period.

CROSS-APPEALS by the plaintiffs, Arthur K. Bourne and another, as trustees, etc., and by the defendants, May B. Strassburger and others, from different parts of a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 27th day of October, 1923, upon the report of a referee appointed to hear and determine the whole issues.

*Gifford, Hobbs & Beard* [*Anson McCook Beard* of counsel; *Lee McCanliss* and *Walter D. Fletcher* with him on the brief], for the appellants May Bourne Strassburger and another.

*Stetson, Jennings, Russell & Davis* [*Anson McCook Beard* of counsel; *Lee McCanliss* and *Walter D. Fletcher* with him on the brief], for the appellant Marian Bourne Elbert.

*Ver Planck & Prince* [*Milton C. Lightner* of counsel; *John B. Coleman* with him on the brief], for the plaintiffs.

MERRELL, J.:

The action is brought by Arthur K. Bourne and Clayton Mayo, as trustees of seven trusts created in and by the last will and testament of Frederick G. Bourne, deceased, for an accounting. The appellants Marjorie Bourne, May B. Strassburger and Marian B. Elbert and the respondents Arthur K. Bourne, Alfred S. Bourne, Florence B. Hard and George G. Bourne are the seven children of the testator. The defendants, appellants, Arthur K. Bourne, Jr., J. A. Peter Strassburger, Alfred S. Bourne, Jr., Kenneth Bourne, Barbara Louise Bourne, Frederick B. Hard, George Wales Hard, Helen Whitney Bourne and Claire Louise Bourne are all infants and are grandchildren of the testator, and are the remaindermen of the several trusts. The testator died on March 9, 1919, leaving as a part of his estate 100,214 shares of stock of the Singer Manufacturing Company, with which company he had been actively identified during his life. In the 5th paragraph of testator's will he bequeathed to the plaintiffs, as trustees, all of such shares, in trust for the benefit of his surviving children during their respective lives with remainders over to their issue. Pursuant to an agreement with all of the life beneficiaries, the executors purchased 5 additional shares of the Singer Manufacturing Company stock and added the stock so purchased to that left by the decedent, making a total of 100,219 shares. This stock was then divided into seven separate trusts, one for the benefit of each of the seven children of the testator. Each trust so created contained 14,317 shares.

The capital stock of the Singer Manufacturing Company, at the time of the testator's death, consisted of 600,000 shares of the par value of $100 each. On October 7, 1920, the directors of the company called a special meeting of stockholders which was held on November 11, 1920. At this meeting an increase of the capital stock of the company was authorized from $60,000,000 to $90,000,000 par value. This increase was to be accomplished by the addition of 300,000 shares of the par value of $100 each. The actual increase took place on the 20th of December, 1920, at which time the directors, to effectuate the same, declared a fifty per cent stock dividend payable out of the surplus of the company on December 31, 1920, to the stockholders of record on December 20, 1920. The directors at this meeting also declared an extraordinary dividend payable on the same date, and to the same class of stockholders, by the distribution of 600,000 shares of the preferred stock of the International Securities Company of the par value of one dollar each. This extra dividend, payable in the stock of the aforesaid company, was paid in the proportion of one share for each share of the stock of the Singer Manufacturing Company held by the respective shareholders. The International Securities Company was a subsidiary of the Singer Manufacturing Company and was a holding company for its European subsidiaries. Pursuant to the aforesaid resolutions the plaintiffs, as trustees, received on December 31, 1920, in addition to the regular cash dividend, the aforesaid two extraordinary dividends, which consisted of 7,158 shares of the stock of the Singer Manufacturing Company, a scrip certificate of one-half share thereof, and 14,317 shares of the preferred stock of the International Securities Company, for each of the seven trusts.

All such extra stock dividends were allocated by the trustees to the corpus of the trusts. Such action was based largely upon the financial statements of the company from which the trustees determined that the dividends so distributed were paid from surplus and profits earned prior to the testator's death.

The life beneficiaries claim the right to the whole of such extraordinary stock dividends as income; and the remaindermen assert that such dividends were properly allocated by the trustees and belong to the corpus of the respective trusts. The referee has found that a part of said extraordinary dividends were paid from profits earned by the Singer Company between March 9, 1919, the date of testator's death, to December 31, 1920, when said dividends became payable, and should be apportioned under the rules laid down in *Matter of Osborne* (209 N. Y. 450) and *United States Trust Co.* v. *Heye* (224 id. 242).

In reaching such conclusion the referee disregarded the financial statements of the company, and admitted evidence which he found to have sufficient probative force to sustain a finding that certain Russian losses, amounting to the sum of $12,206,833.73, should have been charged off the books prior to March 9, 1919, the date of decedent's death. The effect of such finding was to decrease the surplus of the company by the above amount on March 9, 1919, and thus show a corresponding increase in the profits for the next year. The profits for the trust period having been so increased, the referee found that a part of such extraordinary dividends were paid from profits and a part from accumulated surplus, and, applying the rule laid down in *Matter of Osborne (supra)*, apportioned the dividends as follows: 6,951.73 shares to the seven life beneficiaries as income, 993.1 shares to each beneficiary, and 43,155.27 shares to be retained by the trustees as principal. The new corpus of each of the seven trusts would thus consist of 20,481.3 shares.

The referee further found that the trustees should retain all of the aforesaid preferred stock of the International Securities Company, so received as an extraordinary dividend, as a part of the corpus of the respective trusts. As a basis for this last conclusion the referee found that $75,160.50, being the value of the aforesaid International Securities Company preferred stock, had been properly deducted from the increase in the book value of the shares held in trust in order to arrive at the net increase in the book value from March 9, 1919, to December 31, 1920.

The conclusion of the referee, in regard to the aforesaid Russian losses, was as follows: " That there should be deducted from the capital and surplus of The Singer Manufacturing Company on March 9th, 1919, as shown by its books, the sum of $12,206,883.73 erroneously included therein."

The plaintiffs and the guardian *ad litem* for the aforesaid infant defendants contend that the aforesaid losses, so directed to be deducted from the capital and surplus, were properly deducted by the company after March 9, 1919, and that the referee erred in his aforesaid conclusions. The appellants Marjorie Bourne, May B. Strassburger and Marian B. Elbert contend that under the terms of decedent's will they are entitled to receive all of the aforesaid extraordinary dividends; that the books and financial statements of the Singer Manufacturing Company as of December 31, 1918, did not properly reflect the financial condition of the company, in that the aforesaid Russian losses had not been charged off; and further that the company had sustained other losses, which were improperly charged against or paid out of profits subsequent to March 9, 1919. An examination of the balance

sheets and entries relating to the aforesaid losses and the manner in which the same were charged off, leads me to the conclusion that while the directors of the company had reason to think that certain other European losses might or would take place, they were clearly within their rights in charging off such losses in the manner in which they did. The life beneficiaries cannot be heard to question the method employed by the directors in so charging off losses during this period of reconstruction. The financial affairs of the company were entirely in the hands of its directors, and with the possible exception of the Russian losses, there is no evidence whatever even tending to show any impropriety whatever in the manner of such bookkeeping or in the policy pursued by the directors and officers of the company in arriving at its surplus and profit accounts. Such evidence in regard to the Russian losses will be considered after disposing of the questions raised by the life beneficiaries regarding the intention of the testator, as expressed in his will, in respect to the distribution of income.

The testator's will directs the trustees " to receive the dividends and income therefrom and after paying all proper expenses and charges, to apply the net income of the same to the use of such children during his or her life." This is the clause which the life beneficiaries contend evidences an intention on the part of the testator that they should receive all dividends and income of every nature which resulted from the ownership of the aforesaid stock of the Singer Company, including the aforesaid extraordinary dividends. There is no authority in the decided cases for any such holding. The language used by the testator is no stronger than that used in the respective wills under consideration in the well-known cases of *Clarkson* v. *Clarkson* (18 Barb. 646); *Matter of Stevens* (111 App. Div. 773; 187 N. Y. 471); *Matter of Osborne* (209 id. 450); *United States Trust Co.* v. *Heye* (224 id. 242); *Macy* v. *Ladd* (182 App. Div. 216; affd., 227 N. Y. 670). The intention of the testator should of course govern in determining the manner of distributing income or apportioning stock dividends, whenever such intention can be ascertained (*Matter of Osborne*, 209 N. Y. 450; *Matter of Megrue*, 224 id. 284), but I find nothing in the testator's will which indicates any intention that the life beneficiaries should receive any income or profits, except in the usual and ordinary way and in accordance with the accepted definitions of such terms. These extraordinary dividends, therefore, fall within the rules stated in the *Osborne* and *Heye Cases* (*supra*).

The referee, in apportioning the extraordinary dividends among the life beneficiaries and the corpus of the trust, attempted, at least, to follow the rule laid down in the last-mentioned cases and no

## BOURNE v. BOURNE.

First Department, May, 1924. [Vol. 209

party seems to dispute the correctness of such rule where there is a proper foundation for its application.

The findings of the referee in regard to the Russian losses and the apportionment of such extraordinary dividends are, therefore, the only serious questions now before this court for determination. The plaintiff trustees allocated all of such extraordinary dividends to corpus on the theory that no part of such dividends represent profits actually earned and distributed by the company after the creation of the trusts. In so doing the trustees relied upon the financial statements of the Singer Company. The statement of December 31, 1918, included large losses which the directors determined had been sustained by the company and which grew out of the European war. The original value of the Russian assets had been $84,302,230.31, and prior to January 1, 1919, all of such assets had been charged off except the aforesaid sum of $12,206,883.73. It is admitted that the company lost approximately $110,000,000 from the above cause, said losses being sustained in Russia, Germany, France, Italy, Portugal, Holland, Greece and elsewhere.

It was the custom of the company to carry all assets at actual value, any change in value being adjusted from time to time, so that such financial statement of December 31, 1918, was intended to contain the actual value of all of the company's assets. The referee has found that such statement " Set forth the true financial situation of The Singer Manufacturing Company * * * according to the best judgment of the officers and board of directors of the said Singer Manufacturing Company," and that such was the nearest financial statement made by the company to March 9, 1919, the date of the testator's death. The referee then computed the *pro rata* share of the earnings from January 1, 1919, to March 9, 1919, as shown by the books of the company, at $546,230 and added such amount to the surplus earnings as shown on the statement of December 31, 1918.

It is clear that the referee erred in arriving at the *pro rata* sum which he so added to the surplus earnings. This error was caused by the failure of the referee to follow in this regard his prior finding to the effect that $12,206,883.73 of Russian losses should have been charged off prior to March 9, 1919. Such sum having been so charged off by the referee, the earnings for 1919 should have been increased by a like amount. The sum of $2,786,944.73 should, therefore, be substituted as the *pro rata* share of earnings in 1919 prior to March ninth for the sum of $546,230, so found by the referee, which would make the adjusted surplus and capital $123,244,610.68 as of the date of the testator's death, instead

of $121,003,895.95, as computed by the referee. Such error, however, is largely immaterial and will not affect the result, as we shall hold that the referee's conclusion, in regard to the charging off of the Russian losses was erroneous.

The trustees and remaindermen contend, with much force, that the court should not go behind the financial statements of the company and is bound by the acts of its directors and officers in adopting such statements. No fraud or intentional error is charged, and as above noted, the referee has found that the statements were made according to the best judgment of the board of directors.

I am of opinion that in an equitable action, wherein it is sought to apportion stock dividends, the parties are not absolutely bound by the financial statements of a corporation. As it is necessary in these cases to determine whether or not the corpus of the trust is being encroached upon and what the equities are between the parties, the court may take into consideration any facts which are relevant to the issue.

Stock dividends are not, in a true sense, income. When such a dividend is declared, the corporation parts with no property. Strictly speaking, the interest of a stockholder receiving such stock is not enlarged. The action, however, of the board of directors in declaring a stock dividend is *prima facie* evidence that profits have been earned, which, in the judgment of the directors, should no longer remain in a surplus or profits account. Such action having been taken, the beneficiaries, under a trust in which stock in such company is held, have an immediate right to assert their respective claims to the stock dividend and the court must then determine the equities between the parties. (*Matter of Osborne*, 209 N. Y. 450; *United States Trust Co.* v. *Heye*, 224 id. 242; *Macy* v. *Ladd*, 182 App. Div. 216; affd., 227 N. Y. 670.) The rule adopted in the above cases was arrived at after a long period of discussion concerning the distribution and apportionment of stock dividends and differs from the rule adopted by the English courts, the courts of Massachusetts and the Federal Supreme Court. The rule in the last-mentioned jurisdictions is to the effect that all stock dividends belong to the corpus of a trust. (*Brander* v. *Brander*, 4 Ves. Jr. 800; *Bouch* v. *Sproule*, L. R. 12 App. Cas. 385; *Minot* v. *Paine*, 99 Mass. 108; *Gibbons* v. *Mahon*, 136 U. S. 549; *Eisner* v. *Macomber*, 252 id. 189.)

In determining what the equities are among parties claiming all or part of stock dividends, the cases in this State are in accord in holding that the corpus of the trust cannot be permitted to be intrenched upon. (*Clarkson* v. *Clarkson*, 18 Barb. 646; *Simpson* v. *Moore*, 30 id. 637; *Goldsmith* v. *Swift*, 25 Hun, 201; *Cragg* v.

*Riggs,* 5 Redf. 82; *Matter of Rogers,* 22 App. Div. 428; *Matter of Osborne,* 209 N. Y. 450; *United States Trust Co.* v. *Heye,* 224 id. 242; *Macy* v. *Ladd,* 227 id. 670.)

Judge CHASE, in *Matter of Osborne* (*supra,* p. 475), said: " We think that in each case the court should look into the facts, circumstances and nature of the transaction and determine the nature of the dividend and the rights of the contending parties according to justice and equity. * * * Notwithstanding the difficulty in many cases of apportioning dividends, it is wiser and better to leave an apportionment to courts of equity, in preference to adhering to a rule that depends more upon its simplicity and convenience of enforcement than upon justice and right. The distinction between ordinary and extraordinary dividends is necessary to make a workable rule and at the same time preserve the integrity of the trust fund. The integrity of the trust fund and rights of the life beneficiary under the trust should each be considered, determined and preserved by a court of equity. * * * Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

In commenting upon this statement, Judge CRANE, in *United States Trust Co.* v. *Heye* (*supra*), says: " This does not mean that the principal of the trust fund has to remain at the same value, and that all increase belongs to the life beneficiaries. While the corpus of the fund may not be depleted, yet the corpus may accumulate or increase, and until there is some division in the nature of a dividend payable out of accumulated earnings or profits, there is nothing that can be awarded as income to beneficiaries. Although stockholders own, proportionately to their holdings, the right to share in the corporate assets, they belong to the corporation until the corporation agents exercise their discretion and divide them among the stockholders. (*Robertson* v. *de Brulatour,* 188 N. Y. 301.) "

In *Matter of Schaefer* (178 App. Div. 117) the court said: " Where the trust fund consists of corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustee in any form or manner the life tenant is entitled to receive them."

*Matter of Schaefer* (*supra*) was affirmed by the Court of Appeals on opinion of SCOTT, J., in Appellate Division (222 N. Y. 533).

In deciding the above cases the courts of this State deliberately departed from the well-known rules adopted in other jurisdictions, as above noted. The rules are now being followed by trustees throughout the State and we have only to apply them to the facts in the case at bar.

It follows from the above that in order to apportion any part of the stock dividends to the life beneficiaries, it must first appear that some part thereof represents profits earned and distributed subsequent to March 9, 1919, and that the corpus of the trust is not intrenched upon. If the evidence in that regard is doubtful or uncertain, it should be disregarded and the doubt resolved in favor of the trustees, who have in their discretion allocated the extraordinary stock dividends to capital.

Such being the situation, I will review briefly the evidence upon which the referee discarded the conclusions of the directors of the company in regard to the Russian losses as set forth in the financial statement of December 31, 1918.

The company had been doing business in all parts of the world. Subsidiary companies had been organized throughout Europe and losses had occurred. Prior to December 31, 1918, the revolution in Russia had taken place and certain alleged decrees or edicts pronounced by means of which the confiscation of much property was intended to be brought about. This government has never recognized the revolutionary government of Russia and such decrees have no force or effect and are of no importance except as interesting facts tending to fix dates. (*Russian Commercial & Industrial Bank* v. *Comptoir D'Escompte de Mulhouse* L. R. [1923] 2 K. B. 630.) (See *Russian Socialist Federated Republic* v. *Cibrario*, 198 App. Div. 875.) It is quite apparent from what has already been said that in the case at bar it is difficult if not entirely impossible to arrive at the exact condition of the assets of the Singer Company as of December 31, 1918. In order to do so, it would be necessary to obtain more exact data than the evidence presents in regard to just what did happen to the business and property of the company throughout all parts of Europe during the period in question. The task was so difficult that the life beneficiaries practically abandoned all efforts along that line with the exception of the evidence offered in respect to the Russian losses.

The assets of the company in Russia consisted of the ownership of all stock of the Russian corporation known as the Kompanija Singer. This subsidiary company in turn owned and controlled

a large factory at Podolsk alleged to be worth with its equipment $12,000,000, extensive timber lands in the District of Kostroma, comprising approximately 125,000 acres, a large office building in Petrograd costing several millions of dollars, and general offices in Moscow and a vast number of stores, depots and warehouses scattered throughout Russia and Siberia. Such company also had large accounts receivable and bank deposits. The Kompanija Singer owed the parent company large sums of money on an open account and the parent company held the stock of the Russian company. The Singer Company also owned Russian government bonds of a large amount. Such Russian assets had been actually worth $84,302,230.31, and prior to January 1, 1919, all of this large sum had been struck off the company's books with the exception of the aforesaid sum of $12,206,883.73, which the referee has held was retained by the directors upon the books acting upon their best judgment in regard to the finances of the company. The referee also held that the directors deemed this latter figure a fair valuation as of December 31, 1918. Representatives of the company testified that the revolutionists in Russia confiscated the factory of the Russian subsidiary in the latter part of 1919. The balance of said Russian assets were written off at the end of 1919, and it is conceded that the Russian holdings of the company have been entirely lost.

The life beneficiaries in attempting to go behind the financial statements of the company, endeavored to show what the conditions in Russia were up to March 9, 1919. Reliance is had principally upon the testimony of one Alexander Gumberg. Gumberg was born in Russia and lived there until he was fifteen years old, when he came to the United States and resided in Brooklyn for some time. He worked at odd jobs until 1908, when he became a drug clerk, and worked in a drug store as a clerk until 1912. In 1912 he was employed as a traveling salesman, and then became connected with a Russian newspaper in New York where he continued until the fall of 1915. At that time he obtained employment with the Canadian Pacific Railway Company, where he remained until 1916. From 1916 to 1917 he was engaged in the manufacture of machine tools and went to Russia in 1917 and was connected with the Red Cross. He was permitted to testify that he knew various persons who were at the head of the Russian Soviet who told him what the policy of the Revolutionary government was. He translated certain alleged decrees of such government which related to the nationalization of property in Russia. Gumberg admitted that he knew practically nothing concerning the property of the Kompanija Singer, except that he was somewhat familiar

with the plant at Irkutsk, Siberia, and that he had a friend who had an office in the office building in Petrograd, and that this friend told him that he did not know whether to pay rent to the local Soviet or to the Singer Company. He testified that wholesale nationalization took place after he left Russia, and that prior thereto certain industries had been nationalized. As he expressed it, one decree was issued after another nationalizing certain plants, and that he knew about the nationalization of some of the plants. This general testimony has little weight as against the financial statements of the Singer Company made up by its officers and directors who may be presumed to have been informed concerning the assets and properties of the corporation in Europe.

Walter F. Dixon, who was called by the life beneficiaries, was at the time of the trial manager of the Elizabethport works of the Singer Company. This was the main factory in the United States. Dixon testified that he was employed by the Russian Singer Company from 1900 until the fall of 1917, and that he left Russia in November of that year; that according to reports of men in the employ of the Singer Company, many of the plants remained in the hands of the company during all of 1918 and a part of 1919. Not only was the evidence given by Gumberg insufficient to vary the statements contained in the financial reports of the Singer Company, but it affirmatively appears from the evidence of witnesses that certain of the properties of the Russian subsidiary remained intact during a part, at least, of 1919. The greater part of such losses had been charged off and it is unreasonable to contend that the board of directors should have charged off greater losses than they were certain had occurred. Such being the situation, it is impossible to find from the evidence produced by the life beneficiaries that any part of stock dividends were a distribution of net profits actually earned subsequent to March 9, 1919. It, therefore, would be inequitable and contrary to the well-settled law to apportion to the life beneficiaries any part of such extraordinary dividends. It is important, also, that the referee found that the net earnings or profits of the Singer Company as shown by its books were for the .year 1919, $2,975,728.10, and for the year 1920, $2,518,381.34, and that the cash dividends paid by the company during those years aggregated $10,212,000. These cash dividends thus exceeded the net earnings and profits of the company for the years 1919 and 1920 by $4,717,890.56. It is, therefore, apparent that such excess came from earnings or surplus of previous years and encroached thereon. This is a strong argument in favor of the plaintiff's contention that no part of the stock dividends can be allocated to the life beneficiaries without intrench-

ing upon the corpus of the trust, and that no part of such stock dividends constituted a distribution of profits earned since March 9, 1919.

From the foregoing, it follows that the judgment entered upon the report of the referee should be modified by allocating all of said stock dividends to the corpus of the respective trusts, that the findings should be modified in accordance herewith, and as so modified the judgment appealed from should be affirmed, with two separate bills of costs of this appeal, payable from the principal of said trusts, one to the plaintiff trustees and one to the guardian *ad litem* of the infant defendants.

CLARKE, P. J., DOWLING and McAVOY, JJ., concur.

Judgment modified as indicated in opinion and as so modified affirmed, with costs separately to the plaintiff trustees and to the guardian *ad litem* of the infant defendants.   Settle order on notice.