FRANK K. STURGIS and Another, as Trustees under the Will of FRANK WORK, Deceased, and as Trustees under Certain Deeds of Trust Thereby Created for FRANCES ROCHE and Others, and Another, Plaintiffs, *v.* FRANCES ROCHE and Others, Appellants, Respondents, Impleaded with EDMUND MAURICE ROCHE and Others, Respondents, Appellants, and NELLIE W. MERRICK, Defendant.

First Department, July 6, 1926.

Trusts — testamentary trusts — apportionment of extraordinary stock dividends between life tenants and remaindermen — trust included stock of railroad company which owned coal properties — new corporation was formed and purchased coal properties — stockholders ·of railroad company were given privilege of buying stock in coal company at five dollars per share — trustees purchased their allotment and financed purchases by selling portion of shares of coal company — subsequently railroad company declared 100 per cent stock dividend — subscription rights in stock of coal company belonged to remaindermen — coal property was sold for actual value — value of shares of coal company not determined by market value — value of shares of coal company not to be considered in determining distribution of extraordinary stock dividends by railroad company — in determining share value of railroad stock at time of creation of trust actual value of railroad property is to be considered — fact that railroad company did not carry coal properties as assets not controlling — evidence does not show whether stock dividend was from profits earned after creation of trust — in absence of proof it will be assumed that dividend was declared out of earnings accruing since creation of trust.

The sole question in this action for the judicial settlement of the accounts of trustees of certain trust funds, the principal of which includes shares of stock of a railroad company, is the proper distribution of a 100 per cent extraordinary stock dividend between the life tenants and the remaindermen. At the time of the creation of the trust the railroad company owned certain coal properties. Subsequently, a new corporation was formed which purchased the coal properties and paid therefor $60,000,000. The coal company offered to each shareholder

of the railroad company the right to subscribe for as many shares of the coal company's stock as he had held of the railroad company stock at five dollars per share. The trustees exercised their right and financed their subscription by selling a portion of the coal company's stock for almost enough to pay for the entire amount subscribed. The trustees allocated the remaining shares of the coal company's stock to the principal of the trust fund.

The contention by the life tenants that the distribution of the coal company's stock at five dollars per share constituted a partial liquidation of the assets of the railroad company cannot be sustained, for on the record it is clear that the railroad company received full value for the coal properties sold to the coal company.

The right granted to the trustees to subscribe for shares of stock in the coal company was a right which belonged to the principal of the trust fund and, therefore, the trustees properly allocated the shares so purchased, which were paid for by the sale of a portion of the shares, to the principal of the trust fund.

The actual value of the shares of the coal company are not to be determined by their market value, and, furthermore, the value of the shares of the coal company cannot be considered in determining the distribution of the extraordinary stock dividend between the life tenants and the remaindermen.

For the purpose of determining the share value of the railroad company's stock at the time of the creation of the trust the court is not bound by the book value of the assets of the railroad company but may go beyond the books and determine the actual value of its assets, and, therefore, the fact that prior to the creation of the trust the bulk of the coal properties had been written off by the railroad company on its depletion account and were not carried as assets at the time of the creation of the trust, does not prevent the courts from determining the actual value of the coal properties and adding it to the value of other assets for the purpose of determining the share value of the coal company's stock.

There is no evidence in the record to show whether or not the extraordinary stock dividend represents any part of accumulated earnings which accrued prior to the creation of the trust or whether it represents solely earnings accruing after their creation, and upon this state of the record in this case the court assumes that the extraordinary stock dividend was declared out of earnings that accrued since the creation of the trust.

APPEAL by the defendants, Frances Roche and others, from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 10th day of July, 1924, upon the decision of the court rendered after a trial at the New York Special Term.

The judgment instructs the trustees to apportion between the life tenants and remaindermen 14,434 shares of the capital stock of the Delaware, Lackawanna and Western Railroad Company, declared July 28, 1921, and received August 20, 1921, by said trustees as an extraordinary 100 per cent stock dividend.

*Henry B. Closson* of counsel [*A. Loeb Salkin*, attorney], for Frances Roche and others, appellants, respondents.

*A. J. McMahon* of counsel [*William S. Jenney*, attorney], for Edmund Maurice Roche and others, respondents, appellants.

WAGNER, J.   This action was brought by plaintiffs for a judicial settlement of their accounts as trustees of certain trust funds established under the will of Frank Work, who died March 16, 1911, and by a so-called family agreement dated February 20, 1914, executed by all those beneficially interested in said estate. In their complaint the trustees pray not only that their accounts be judicially settled but that they be instructed by the court concerning the distribution and apportionment between the life tenants and remaindermen of certain 14,434 shares of the Delaware Lackawanna and Western Railroad Company stock, representing an extraordinary 100 per cent stock dividend declared July 28, 1921, and received by them on August 20, 1921.   All of the interested life tenants and remaindermen herein answered the complaint and admitted all of its allegations, and joined with the plaintiffs in the prayer for relief contained in the complaint.

The trial court, by its decision and judgment entered herein, gave the trustees directions as to the manner in which they should apportion the said stock dividend between the life tenants and remaindermen, and the accounts of the trustees containing a record of such apportionment of said stock dividend as so directed were judicially settled.   From such distribution and apportionment as directed by the trial court, cross-appeals are here prosecuted, both by the life tenants, Frances Roche, Lucy Work Hewitt and Cynthia Cary, and by the remaindermen, Edmund Maurice Roche, Francis George Roche, Eileen Burden, and Guy Fairfax Cary, Jr., the last two named being infants under the age of fourteen years.

For several years prior to July 28, 1921, the trust funds had been divided into six separate accounts, and among other securities constituting the principal thereof were 14,434 shares of the capital stock of the Delaware, Lackawanna and Western Railroad Company which the trustees had properly allocated among the various trusts.   All the trust funds were held on like terms, which provided for the " payment of income " to the respective life beneficiaries, with remainders over.

The sole contention of the life tenants on this appeal is in respect of the factors that should be considered in ascertaining and fixing the share value of the capital stock of the Delaware, Lackawanna and Western Railroad Company on July 28, 1921, the date of the declaration of such extraordinary 100 per cent stock dividend. It is a general principle that, in establishing whether an extraordinary stock dividend should go to the life tenant or to the remainderman, the court should look into the facts and circumstances and the nature of the transaction, and determine the nature of the dividends and the rights of the contending parties according to justice and equity.

(*Matter of Osborne*, 209 N. Y. 450, 475.) The life tenants maintain that the determination of the proper distribution between income and principal of this extraordinary 100 per cent stock dividend requires consideration of the facts and circumstances surrounding a certain sale of all of its coal properties made July 21, 1921, by the Delaware, Lackawanna and Western Railroad Company to a certain corporation known as the Glen Alden Coal Company.

The following is a summary of the facts appertaining to the sale by the Delaware, Lackawanna and Western Railroad Company of its said coal properties:

On May 16, 1921, the Delaware, Lackawanna and Western Railroad Company, which is a corporation organized under various special acts of the Legislature of the State of Pennsylvania, owned and operated, and, for upwards of fifty years, had owned and operated, both railroads and coal properties. Some time prior to May 16, 1921, it had been determined by those in control of the affairs of the said railroad company that its coal properties should be segregated, and for that purpose the following plan was adopted: William W. Inglis, vice-president of said railroad company and general manager in charge of its said coal properties, was invited to promote a new coal company, which should make an offer for said coal properties. For local reasons it was important to acquire an old charter for the new company. An old coal company charter was accordingly obtained, and the name of the chartered company was changed to the Glen Alden Coal Company. All of the stock of said Glen Alden Coal Company, consisting of the same number of shares as the then outstanding and issued shares of the Delaware, Lackawanna and Western Railroad Company, namely, of approximately 850,000 shares of no par value, was acquired in the name of said William W. Inglis and his associates, and said William W. Inglis became its president. Said Glen Alden Coal Company, on or about June 15, 1921, offered the Delaware, Lackawanna and Western Railroad Company $60,000,000 for all of the latter company's coal properties; such offer was accepted by the board of directors of the said railroad company, subject to the approval of its stockholders. Thereupon and on or about June 17, 1921, a contract for the sale of said coal properties for that price was approved by both the railroad company and the coal company, and on or about July 25, 1921, executed.

While there was no express agreement on the subject, it was understood by the railroad company and by the coal company, at the time when said offer was made and accepted and said contract was prepared and executed, that all of the stockholders of the railroad company would be invited to subscribe to the stock

of said Glen Alden Coal Company at five dollars per share in amounts equivalent to their stockholdings in the said railroad company. Such arrangement was essential to insure the approval of the railroad company's stockholders to the sale of the coal properties upon the proposed terms of sale and to forestall litigation.

In pursuance of such plan, on May 16, 1921, the Glen Alden Coal Company sent to each of the stockholders of the railroad company, including the trustees herein, a notice stating, among other things: " The Glen Alden Coal Company has offered the Delaware, Lackawanna & Western Railroad Company the sum of Sixty Million Dollars for its anthracite coal properties, to be paid as per terms of contract of sale, with interest at four per cent. * * * We shall offer this stock [Coal Company's stock] to the stockholders of the Delaware, Lackawanna & Western Railroad Company of record at the close of business June 15, 1921, on the basis of one share of Glen Alden Company stock for each share of Railroad Company stock, at Five Dollars ($5.00) per share payable on , or before August 20, 1921. * * * This Company [Glen Alden Coal Company] will be operated by officials now employed in the Coal Mining Department of your Company [Delaware, Lackawanna & Western Railroad Company], the Vice President and Manager of such Department having been selected as its President."

This notice was accompanied by another notice, likewise dated May 16, 1921, from the Delaware, Lackawanna and Western Railroad Company to each of its stockholders, including these trustees, stating that it had applied to the Interstate Commerce Commission for authority to increase its capital stock by an amount equivalent to the surplus of the company, or to such part of said surplus as the said Interstate Commerce Commission might authorize to be transferred to the capital account of the company and, upon receipt of such authorization, to issue and distribute such new stock of a par value of $50 per share as a stock dividend to its stockholders *pro rata* according to their respective stock holdings at the time of such distribution; that the Interstate Commerce Commission by order dated April 20, 1921, had approved the issuance of $45,000,000 of additional capital stock and that, in consequence, a special meeting of stockholders of the railroad company would be held on July, 21, 1921, for the purpose of authorizing the proposed increase in capital stock, when, " If so approved by you, a stock dividend of 100 per cent will be declared." .

Said further notice of May 16, 1921, from the railroad company

also stated: " A contract for the sale of the anthracite coal properties of the Company to the Glen Alden Coal Company has been prepared and will also be submitted to you [stockholders] at such special meeting for approval. The proposed consideration therefor is the sum of Sixty Million Dollars, with interest at four per cent, to be secured by a purchase-money mortgage upon the real estate conveyed."

At the close of business on June 15, 1921, the railroad company gave to the coal company a list of the railroad company's stockholders. The coal company, on June 18, 1921, sent out subscription blanks to all the railroad company stockholders for subscriptions to the stock of the coal company to the amount of one share of new coal company stock for one share of the stock of the railroad company, and at the price of five dollars per share, which was required to be paid on or before August 20, 1921, and stated that temporary certificates of stock of the new coal company could be obtained on and after June 27, 1921. On July 21, 1921, at such special meeting of the stockholders of the railroad company the agreement for the sale of said coal properties was duly approved by resolution of said stockholders.

On or about August 19, 1921, the trustees herein, as stockholders of the railroad company, subscribed for 14,434 shares of the coal company stock, in accordance with the terms stated in the subscription blank, at $5 a share, that is, at a total cost of $72,170. To finance this purchase, on the same day as their subscription, the trustees sold at public sale 2,200 shares of coal company stock so subscribed for, at the prevailing market price of $32.35 a share, realizing on such sale the sum of $71,182, which was the full subscription price, less $988, for the total of 14,434 shares of coal company stock for which they subscribed.

On August 20, 1921, the trustees received 14,434 shares of the capital stock of the Delaware, Lackawanna and Western Railroad Company as a 100 per cent stock dividend, with the apportionment of which, as between the life beneficiaries and the remaindermen, we are here concerned.

The trustees have allocated and apportioned the remaining 12,234 shares of the Glen Alden Coal Company stock to the capital accounts of the respective trust funds, regarding the same as capital and not income, and the life tenants herein make no claim to such shares of the coal company. They concede that these shares have been properly allocated by the trustees to the capital of the trust funds.

The life beneficiaries contend, however, that the facts and circumstances of the sale of the railroad company coal properties,

as above stated, compel the conclusion that in reality and substance the distribution and receipt of the shares of the stock of the Glen Alden Coal Company amounted to a partial liquidation of the corporate assets of the Delaware, Lackawanna and Western Railroad Company; that in ascertaining the share value and in determining the amount necessary to maintain the corpus of the trust funds, there must be added to the value of the trust investment in the railroad company's stock at the time of the declaration of the stock dividend what the life tenants term " the value of the previous partial distribution of the capital assets of the railroad company, represented by the Glen Alden Company stock," measured by its then market value; that by such method of computation, the total of these two values will be found to exceed the total value of the trust investment in the railroad company's stock at the time of the creation of the various trust funds; that, therefore, there has been no impairment of the trust fund by the distribution of the extraordinary stock dividend, and that accordingly the whole of the stock dividend received by the trustees should be awarded to the life tenants.

The contention of the life beneficiaries is entirely based upon an erroneous assumption, unsupported by any facts in this record, namely, that the stated purchase price of $60,000,000 paid by the coal company to the railroad company for its coal properties was not the full consideration paid therefor, and that the shares of the Glen Alden Coal Company in reality represent a claimed and assumed equity therein over and above said stated purchase price.

The acts of the directors and stockholders of the Delaware, Lackawanna and Western Railroad Company, in respect of the sale of their coal properties, are controlling, and full faith and credit must be given thereto, unless shown by the life beneficiaries to be fraudulent or in excess of their powers and authority. (*Matter of Osborne*, 209 N. Y. 450; *Bourne* v. *Bourne*, 240 id. 172.) Here no such claim is made or even intimated by the life beneficiaries, nor is there any evidence or proof in this record that in any way contravenes or contradicts the fact that at the special meeting of the stockholders duly and regularly called and held on July 21, 1921, the stockholders of the Delaware, Lackawanna and Western Railroad Company, including these trustees, after being fully advised, voted to sell and dispose of all the coal property of the railroad company for the proposed consideration of $60,000,000 with interest at four per cent to be secured by a purchase-money mortgage upon the real estate conveyed.

The recorded facts here in respect of the consideration for and

sale price of the railroad company coal properties reasonably permit of only one conclusion, namely, that the agreed price and full consideration for which all such coal properties were sold was $60,000,000. All of the stockholders of the railroad company were content and satisfied to sell the same at this figure and by resolution at the special stockholders' meeting aforesaid ratified and approved the directors' acts in connection therewith.

The facts in this record indicate that the shareholders of the Delaware, Lackawanna and Western Railroad Company secured the opportunity of subscribing to the stock of the Glen Alden Coal Company by the special arrangement made between the directors of the two companies hereinabove already referred to. This subscription privilege very probably was accorded as an inducement to obtain the stockholders' consent to the sale of the railroad company's coal properties for the stated consideration, but that fact in no way transforms a privilege of subscription into any assumed equity in the coal properties over and above the agreed sale price of $60,000,000. The argument of the life beneficiaries in this respect is founded and rests upon a state of facts, if any, entirely outside of this record.

The 12,234 shares of the Glen Alden Coal Company's stock now apportioned and allocated by the trustees to the various trust funds herein with the approval of the life beneficiaries, do not represent a partial liquidation of the assets of the Delaware, Lackawanna and Western Railroad Company, but were obtained by the exercise of the privilege of subscription afforded by the coal company to the shareholders of the Delaware, Lackawanna and Western Railroad Company. The right to subscribe for additional shares of stock, and the proceeds of such subscription right, have always been regarded as an incident and an attribute pertaining to the stock, and belongs to the principal of the trust fund. (*U. S. Trust Co.* v. *Heye,* 224 N. Y. 242, 262.) The value of this subscription right is not to be measured by any supposed equity over the agreed purchase price of $60,000,000 paid for the coal properties of the railroad company. But its value depends upon and is measured, as are all subscription rights, by taking account of other considerations.

Nor is the intrinsic or actual value of the shares of the Glen Alden Coal Company stock measured by their sale price in the public market, nor is their value, intrinsic or actual or otherwise, to be taken into consideration as a factor or element in determining and ascertaining whether the corpus of the various trust funds in the hands of these trustees was encroached or entrenched upon.

This particular point has been conclusively determined adversely

to the present contention of the life beneficiaries herein, in the case of *Matter of Schley* (202 App. Div. 169), decided by this court in July, 1922, and unanimously affirmed without opinion by the Court of Appeals in 234 New York, 616. In *Matter of Schley* (*supra*), among the securities constituting the trust fund there in question, there were 675 shares of Central Trust Company stock. After the creation of the trust, the Central Trust Company declared a cash dividend of $66⅔ per share and simultaneously increased the capital stock of the trust company and gave a right to subscribe to the stock to its shareholders. With the proceeds of the cash dividend amounting to $45,000, the trustees exercised their right of subscription and secured 450 additional shares of the Central Trust Company stock at the par value of $100 per share. The cash dividend of $45,000 was apportioned by the court between capital and income, and thereafter the trustees sold the said 450 shares of additional stock at a public sale, realizing a profit of $315,000 over and above the said purchase price of $45,000. Sometime thereafter the Central Trust Company declared a further extraordinary stock dividend of eighty-four per cent, which resulted in the trustees therein receiving 567 additional shares of the Central Trust Company stock. The question for decision was the proper apportionment of such 567 shares of the Central Trust Company stock as between the life tenants and the remaindermen. The life tenants made exactly the same contention as do the life beneficiaries here, and urged that the profit derived by the trustees from the sale of the 450 shares of Central Trust Company stock should be applied as an offset against the impairment in the corpus of the trust fund caused by the said declaration and payment of the eighty-four per cent stock dividend by the Central Trust Company.

This contention of the life tenants in *Matter of Schley* (*supra*) was directly considered by this court as shown by the opinion of Mr. Justice DOWLING (202 App. Div. 169), where it is stated (at p. 178): " But treating the 450 shares as principal and the profit made upon their sale as principal also, can that profit be made a factor in determining whether the latest dividend of 567 shares of stock should be credited to income or principal and whether the payment of such dividend to the life beneficiaries will deplete the principal of the trust fund so as to reduce it below its original amount? "

After stating that the trial court, because the effect of crediting the $315,000 profits to principal of the trust fund would be to raise it to a total in excess of the original amount of the trust fund, thus enlarging the fund, had held that the 567 shares should go

to income, this court then quoted with approval the following from *Baker* v. *Thompson* (181 App. Div. 469; affd., 224 N. Y. 592): " It has uniformly been held in this State that new shares of stock purchased by trustees in the exercise of subscription rights given to the stockholders, and the proceeds of the sale of such subscription rights are capital of the trust estate to which the life beneficiary is not entitled." This court then decided the question presented adversely to the contention of the life tenants there, and stated (at p. 180 of the opinion): " The present question concerns solely a profit made on an outside transaction by which a profit was realized upon a sale of stock forming a part of the principal of the fund, and I think, therefore, while such profit is a part also of the principal of the fund and increases its amount beyond the original total, that as such increase is due solely to profits upon the stock made by sale and not to anything in the nature of a dividend declared or paid by the trust company, *the amount of the profit realized upon such sale is not to be considered as an element in determining whether the 567 shares shall go as income to the life beneficiaries.*" (Italics of court.)

If the value of the shares of the Glen Alden Coal Company were required to be considered, the suggestion of the life beneficiaries that such value should be fixed at its sale value in the open market, that is, at its market value, could not be approved. The sale price on the stock market or the market value contains speculative elements which are quite independent of the actual value of the corporate assets, and may be the result of circumstances having no relation whatever to their present actual value. Stocks that are intrinsically sound are often sold at low prices, and stocks that are intrinsically worthless are sometimes kept up at high prices by ways peculiar to the stock market. Should the court use such value as a basis for determining the relative rights of life tenants and remaindermen, serious injustice might be done. Recognizing this possibility of injustice, should the market value of securities be considered in apportioning an extraordinary dividend, the Court of Appeals, in *Matter of Osborne* (209 N. Y. 450, 485), laid down the rule: " Market value, good will and like considerations cannot be considered in apportioning a dividend."

We have not overlooked the claim of the life tenants that the sum of $10,141,716.21 should be included among the assets of the Delaware, Lackawanna and Western Railroad Company as of July 28, 1921. We agree with the trial court that this item did not constitute assets and had been properly charged by the railroad company to operating expenses of the coal properties.

We consider the case of *People ex rel. Queens County Water Co.* **v.**

*Travis* (171 App. Div. 521; affd., 219 N. Y. 571), relied upon ·by the life tenants, inapplicable to the present question which concerns the division of an extraordinary stock dividend between life tenants and remaindermen. The cited case involved a construction of the Tax Law, and under section 186 of the·Tax Law dividends are taxed, regardless of their source or nature, whether declared from accretions to capital, or from earnings.

We hold that in apportioning this extraordinary 100 per cent stock dividend, the Glen Alden Coal Company stock subscription should be disregarded by the trustees and given no consideration in apportioning such stock dividend between the life tenants and remaindermen.

The remaindermen claim that error was committed in the court's fixation of the value of the corporate assets of the Delaware, Lackawanna and Western Railroad Company at the time the trust funds herein were created, that is, respectively on March 16, 1911, and on February 20, 1914, as well as on July 28, 1921, the time when this extraordinary stock dividend was declared, in that there was not included as part of the assets of the corporation a figure representing the intrinsic or actual value of these coal properties.

Prior ·to ·1907, as a matter of bookkeeping, the Delaware, Lackawanna and Western Railroad Company had written off on its " depletion " account all the value of these coal properties, and the same were carried upon their books as of no value whatever.

As stated by this court in *Bourne* v. *Bourne* (209 App. Div. 419, 425; affd., 240 N. Y. 172): " In an equitable action wherein it is sought to apportion stock dividends, the parties are not absolutely bound by the financial statements of a corporation. As it is necessary in these cases to determine whether or not the corpus of the trust is being encroached upon and what the equities are between the parties, the court may take into consideration any facts which are relevant to the issue." On appeal to the Court of Appeals (240 N. Y. 172, 177, 178), in respect of entries in the corporate books showing losses, that court stated: " He who criticises their action must prove that it resulted from ignorance or mistake or error as to fact or law. The burden is upon him as to any items which he disputes. But investigation to this extent of the action of directors is always permissible. If in their balance sheet of a certain date they have included among the items of capital and surplus assets in truth previously destroyed, claims previously lost, in making our comparison we take account of that fact. Their delay in charging off such losses should not control us in apportioning the stock dividend."

Thus the established rule not only permits, but requires us to

examine the financial statement or balance sheet of the corporation and ascertain if possible from the facts and evidence in the record both whether items of capital and surplus assets, in truth previously destroyed, are erroneously entered as existing and of value, and whether items of capital and surplus assets, actually existing, are erroneously entered as not existing or destroyed and of no value, that is, we should take account of the actual facts, whatever they may be.

What then, as a matter of fact, were the actual corporate assets and corporate surplus of the Delaware, Lackawanna and Western Railroad Company in 1911, in 1914 and in 1921? Certainly the mere circumstance that no valuation of these coal properties was entered in or appeared on the books of the railroad company cannot require the court to be blind to the uncontradicted fact that these coal properties nevertheless existed and constituted a part of its corporate assets and property during the years in question, and had a large actual value.

In respect of the value of these coal properties as it was entered in the books of the Delaware, Lackawanna and Western Railroad Company, the general auditor of the railroad company testified: "That prior to the year 1907 the original cost of the railroad company's coal properties, which were the subject matter of the sale to the Glen Alden Coal Company, had been amortized in a depletion account and entirely charged off and that the remaining coal properties were not thereafter carried on the company's books as an asset; that between the said year 1907 and the date of the sale of said coal properties, the Railroad Company acquired other coal mining property which appeared on its books as a net asset at the date of the sale at $1,363,923.76; that all of said coal properties were sold and transferred to the Glen Alden Coal Company. * * * That his computation of the capital and surplus of the Delaware, Lackawanna and Western Railroad Company, made as of July 28, 1921, amounting to the sum of $149,275,584.58, did not include the sum of $58,636,076.24, the net proceeds of the sale of the Railroad Company's coal properties to the Glen Alden Coal Company after adjustments under the terms of the contract of sale, because by the terms of the agreement for the sale of said coal properties the purchase price was not payable until September 1, 1921, when title passed * * *."

The total value of the capital and surplus of the Delaware, Lackawanna and Western Railroad Company on March 16, 1911, as carried upon the railroad company's books, was, its general auditor testified, $75,166,670.89, and as of February 20, 1914, $29,437,605.99, and on July 28, 1921, the time of the declaration

of the stock dividend herein, $149,275,584.58; which figures, according to this testimony, " did not include the sum of $58,636,076.24, the net proceeds of the sale of the Railroad Company's coal properties to the Glen Alden Coal Company after adjustments."

Among the findings of fact supported by the evidence it appears that the aggregate capital invested by the Delaware, Lackawanna and Western Railroad Company in these coal properties prior to 1907 was not less than $50,000,000, and that during the fourteen years thereafter and until 1921, when the same were sold, approximately $1,000,000 a year was expended by the railroad company thereon, chargeable to the capital account; also that between the year 1907 and the date of the sale of the coal properties on July 25, 1921, the railroad company had acquired other coal mining properties which were entered in its books at a net worth, at the date of the sale, of $1,363,923.76. Notwithstanding these facts, the railroad company had, prior to 1907, written off upon its books its said coal properties, and they were entered as of no value whatever. Similarly, on March 16, 1911, and on February 20, 1914, they were entered as of no value whatever, and on July 28, 1921, at the sum only of $1,363,923.76.

It is clearly apparent from the uncontradicted evidence in this record that the entries in the corporate records of the Delaware, Lackawanna and Western Railroad Company · which purport to show the book value of its coal properties are not in accordance with the actual facts. We deem the evidence fairly establishes that the actual and intrinsic value of the coal mining properties of the Delaware, Lackawanna and Western Railroad Company on the dates in question, namely, on March 16, 1911, February 20, 1914, and also on July 28, 1921, is fairly represented by the figure $58,636,076.24, that is, the proceeds of the sale to the Glen Alden Coal Company, namely, $60,000,000 less $1,363,923.76, the value of the coal properties as recorded upon the company's books at the time of the sale, and should be taken into consideration in ascertaining the share value of the railroad company's stock in order to determine the rights of the contending parties according to justice and equity.

After adding this item of value to the figures stated in the decision of the trial court as the " book value " of the capital and assets of the Delaware, Lackawanna and Western Railroad Company, the value of each share of railroad stock as of March 16, 1911, will be found to be $221.94; as of February 20, 1914, to be $178.91, and as of July 28, 1921, the date of the declaration of the 100 per cent dividend herein, to be $123.15.

There is, however, no evidence in this record from which it can

be determined whether this extraordinary stock dividend of 100 per cent in question represents any part of the accumulated earnings or surplus which accrued prior to the creation of the trust funds herein or whether it represents solely earnings accumulated after the creation of such trust funds. The only evidence in respect to this surplus is contained in the notice sent by the Delaware, Lackawanna and Western Railroad Company to their stockholders on May 16, 1921, which merely states that the company would apply for authority to " increase its capital stock by an amount equivalent to the surplus of the Company, or to such part of said surplus as the Interstate Commerce Commission may authorize to be transferred to the capital account of the Company."

Upon this state of the record and in this particular case, our view is that no injustice will be done as between the interested parties, no proof having been adduced, if we assume that this extraordinary stock dividend was declared out of earnings that accrued since the creation of the trusts.

Accordingly we hold, with this change in the share value of the railroad company's stock at the respective dates concerned, the 14,434 shares of railroad stock now in the hands of the trustee, representing the 100 per cent stock dividend, should be apportioned between the life beneficiaries and the remaindermen in accordance with the rules for division and distribution stated in *Matter of Osborne* (209 N. Y. 450) and by using as a basis for the ascertainment of the share value at the respective dates the factors above indicated to constitute the total corporate assets.

From the foregoing it follows that the judgment appealed from should be modified by changing the figures representing the intrinsic or actual value of the corporate assets and surplus of the Delaware, Lackawanna and Western Railroad Company on March 16, 1911, February 20, 1914, and July 28, 1921, as hereinabove stated; and as so modified the judgment appealed from should be affirmed, without costs.

CLARKE, P. J., MERRELL, FINCH and MARTIN, JJ., concur.

Judgment modified as indicated in opinion and as so modified affirmed, without costs. Settle order reversing such findings as necessary and containing appropriate new findings on notice.