VALENTINE EVERIT MACY and Another, Plaintiffs, *v.* KATE M. LADD and Others, Defendants.

Supreme Court, Westchester County, November 8, 1926.

Trusts — life estates — apportionment of extraordinary stock dividends between life tenant and remaindermen — rules for apportionment stated — intent of testator is guide — ordinary dividends go to life beneficiary — extraordinary dividends belong to life beneficiary except when they intrench on capital of trust — remaindermen entitled to accretion in value of corpus — " corpus " defined — stock of subsidiary corporations purchased from earnings after creation of trust may be distributed to life beneficiary — life beneficiary entitled to increase in surplus on revaluation of stock of subsidiaries — size of income from trust not considered on distribution of extraordinary stock dividend — determination of directors as to revaluation of stock of subsidiary corporations not questioned by court.

This is an action by trustees for the judicial settlement of their accounts under a will wherein decedent after creating a trust directed that the share given to his daughter remain invested and the income thereof be paid to her during her life. The will further directed that said trustees leave undisturbed such investments as they might find,therein unless by the sale thereof the estate would be benefited. Their account shows that they awarded the entire amount of two extraordinary stock dividends to decedent's daughter. The remaindermen, however, claim that part of said dividends should be awarded to the principal of the trust fund. •

The fundamental guide to a proper award of extraordinary stock dividends as between a life tenant and remaindermen is the intention of the decedent which must be gathered from the language of the will or from the situation surrounding its execution whenever this is possible. But in the event the testator's intention is expressed ambiguously or indefinitely, resort must be had to the circumstances surrounding the declaration of the extraordinary stock dividend to determine whether or not said dividend was a distribution by the corporation of the accumulated earnings or profits or of that which was capital.

The mere adoption by the corporation of a resolution cannot change the accumulated earnings into capital, as between the life tenant and the remaindermen, but if it is based upon the facts and is not purely arbitrary, it will be given effect by the courts.

Ordinary dividends on stock of a corporation go to a life beneficiary of the trust regardless of the effect upon the corpus of the trust. But extraordinary dividends payable from the earnings of the company accumulated during the trust period, whether payable in cash or stock, belong to the life beneficiary, unless they intrench in whole or in part upon the capital of the trust fund; in that event such extraordinary dividends must be returned to the trust fund or apportioned between that fund and the life beneficiary so that the integrity of the trust fund may be preserved.

The life beneficiary may not share in accumulated earnings of a corporation, however large, until and unless, through the medium of dividends declared, such earnings by the action of the corporation have been transferred to the stockholders. But when the accumulated profits come into the hands of the trustees in any form or manner, the life tenant is entitled to receive them.

The remaindermen are entitled to the benefit of any accretion in the value of the corpus of the trust which does not arise from the application to capital purposes of earnings accruing after the creation of the trust.

The " corpus " of the trust means the original principal of the trust, plus those increases which legally attach thereto.

The good faith of the directors of a corporation must be presumed; therefore, it cannot be assumed that cash received on the sale of preferred stock issues was diverted from the essentially capital purposes indicated in the preliminary announcements of the corporation relative to the purchase of stock of certain subsidiaries; furthermore, it must be presumed that shares of stock purchased from subsidiaries by the parent corporation after the creation of the trust herein were bought with money representing the earnings rather than the capital of the parent corporation. Moreover, such earnings and increases of value of stock, arising from the purchase of stock in subsidiary corporations by the parent corporation out of its earnings over a period of years after the creation of the trust were available for dividends and distribution to the life beneficiary to the exclusion of remaindermen.

A large increase in surplus of the parent corporation on the revaluation of the stock of the subsidiary corporations on its books representing undistributed earnings of said subsidiary corporations became available to the life tenant to the exclusion of the remaindermen on the declaration of the extraordinary stock dividends out of surplus.

The fact that in the years which intervened between the time of decedent's death and the date of this accounting the stock of one of the corporations in the trust met with such remarkable financial success as to give benefits to the life tenant so out of proportion to the benefits to remaindermen that decedent could not have intended what will accrue from this decision to said life tenant, does not warrant a denial of the award made by the trustees, because the court may not read into the document anything which decedent did not write therein. Nor is it important to the proper determination of this case that the income to decedent's daughter has been great and will be made so much greater by this determination, for it must be presumed that such income, however large, was within the decedent's contemplation when he created the trust in favor of his daughter.

A revaluation of the stock of subsidiary corporations on the books of the parent corporation is largely within the control and discretion of the directors of the corporation, and if they act in good faith in the exercise of business judgment, the courts will not question their determination.

# 734 MACY v. LADD.

ACTION by the plaintiffs, as substituted trustees under the last will and testament of Josiah Macy, Jr., deceased, against the defendants, for the judicial settlement of their accounts.

The schedules referred to in the opinion are as follows:

### SCHEDULE A

Is a statement showing the value per share (New Jersey Company), to wit, $69,666, to be kept good, as claimed by the remaindermen:

(a) Value as of March 23, 1892:

| | |
|---|---:|
| Forest Oil Company, $277\frac{117500}{972500} \times 117.01$ | $32,425 91 |
| Northwestern Ohio Natural Gas Company, $165\frac{184000}{972500}$ $\times 122.12$ | 20,172 90 |
| Standard Oil Company (New Jersey) " old preferred " $503\frac{832500}{972500}$ | |
| Acquired: | |
| March 23, 1892, $\frac{3}{10}$, viz., $151\frac{152500}{972500} \times 212.27$ | 32,086 06 |
| April 1, 1892, $\frac{1}{10}$, viz., $50\frac{375000}{972500} \times 250.00$ | 12,596 40 |
| April 1, 1892, $\frac{6}{10}$, viz., $302\frac{30500}{972500} \times 97.68$ | 29,530 00 |
| Total value of stock acquired March 23, 1892, and April 1, 1892 | $126,811 27 |

| | |
|---|---:|
| Dividing by 4,900 the shares of Standard Oil Company (New Jersey), par $100, received in 1899 in exchange for above (and 17 other stocks, all of which were returned in 1911 and held in the principal of the trust under the order of the court) gives the value per share | $25 88 |
| (b) Increase per share ($100 par) by reason of the acquisition of D. A. P. G. stock | 815 |
| Total | $26 695 |

| | |
|---|---:|
| Converted to the equivalent value of $25 par, gives value per share to be maintained | $6 674 |
| (c) Increased by reason of common stock sold at a premium in 1899 (this increase is not conceded by life tenant) | 005 |
| 1921 | 18 |
| 1922 | 234 |
| | $7 093 |

(d) Undistributed earnings of subsidiaries (not returned to trustees in 1911) taken up in the surplus of Standard Oil Company (New Jersey)

| | | |
|---|---|---|
| between 1892 and 1899...................... | $0 | 63 |
| 1900 and 1907............................... | 1 | 298 |
| | $9 | 021 |

(e) Stock dividends received from subsidiaries and taken up in the surplus of Standard Oil Company

| | | |
|---|---|---|
| (New Jersey) between 1907 and 1921............ | 3 | 912 |
| During 1921................................. | | 623 |
| | $13 | 556 |

(f) Earnings of subsidiaries between 1906 and June 30, 1922, taken up in surplus of Standard Oil

| | | |
|---|---|---|
| Company (New Jersey) June 30, 1922........ | 56 | 11 |
| Total value per share of $25 par, to be kept good as claimed by remaindermen........................ | $69 | 666 |

### SCHEDULE B

Shows the figures involved in the apportionment of the stock dividend (New Jersey Company) as between life tenant and remaindermen, as claimed by the remaindermen:

| | | |
|---|---|---|
| The value per share, to be maintained as shown in Schedule A, is............................. | $69 | 666 |
| Book value per share November 15, 1922. | | |
| Total net assets December 31, 1921............$489,012,548 | | 75 |
| Deduct $10\frac{15}{30}$ twelfths of $9,947,695.13, decrease from operations in 1922................... 8,704,233 | | 41 |
| | $480,308,315 | 34 |
| Add proceeds of sale of 24,124 shares of stock... 3,883,964 | | 00 |
| And increase in value of subsidiaries........... 223,265,515 | | 46 |
| Total net assets November 15, 1922........$707,457,794 | | 80 |

Which, divided by 19,896,485, the shares outstanding after the stock dividend, gives value

| | | |
|---|---|---|
| per share................................. | $35 | 56 |

Reduced to a par of $25, the value of the shares held prior to the dividend, the integrity of

| | | |
|---|---|---|
| which must be maintained, was 19,600×$69.666 | $1,365,453 | 60 |
| The value of the same shares after the dividend was 19,600×$35.56.... ..... ......... ......... | 696,976 | 00 |
| A difference of......................... | $668,477 | 60 |

| | | |
|---|---|---|
| The shares received as a dividend were......... | $78,400 | 00 |
| Deduct the number of a value of 35.56 required to make good the above difference 668,477.60 / 35.56...... | 18,798 | 583 |
| Gives shares distributable to life beneficiary. | $59,601 | 417 |

### Schedule C

Shows the computation to determine the distribution between life tenant and remaindermen, of the 200 per cent stock dividend declared by the Standard Oil Company of New York, November 10, 1922, as claimed by the remaindermen:

| | | |
|---|---|---|
| The book value per share of the shares held for principal prior to the dividend of November 10, 1922, the integrity of which must be maintained, as determined in the computations on which the former stock dividends were distributed, was...... | $108 | 71 |
| Equivalent to, on $25 par...... | 27 | 18 |
| During 1922 prior to November tenth, the value at which the Magnolia Petroleum stock was carried on the books of the Standard Oil Company of New York, was increased by...... | $47,472,760 | 49 |
| Since there were then 3,000,000 shares outstanding, this resulted in an increase in the book value per share of...... | 15 | 82 |
| Adding this to the book value, the integrity of which must be maintained as above, makes the book value per share, to be kept good, for the purpose of this computation...... | 43 | 00 |

Book value per share November 10, 1922.

| | | |
|---|---|---|
| Capital stock December 31, 1922...... | $225,000,000 | 00 |
| Surplus December 21, 1922...... | 78,333,560 | 91 |
| Total net assets December 31, 1922...... | $303,333,560 | 91 |
| Capital stock December 31, 1921...... | $75,000,000 | 00 |
| Surplus December 31, 1921...... | 107,985,141 | 99 |
| Total net assets December 31, 1921...... | $182,985,141 | 99 |
| Increase during 1922...... | $120,348,418 | 92 |

But there were written up on the books of the company the following items:

Magnolia Petroleum stock .....$88,525,540 49
Compensation insur-
   ance reserve..... $591,330 63
Less credit to this re-
   serve in 1922..... 35,739 01
                           555,591 62

                       $89,081,132 11
Less previous " appreciation "
   written off.................. 2,366,109 55
                          $86,715,022 56

   Increase from earnings during 1922........ $33,633,396 36

Total net assets December 31, 1921............ $182,985,141 99
Add $10\frac{10}{80}$ twelfths of $33,633,396.36, increase
   from earnings during 1922................. 28,962,091 31
Add write-up on Magnolia Petroleum stock prior
   to November tenth ....................... 47,472,760 49
Add compensation insurance reserve adjustment. 555,591 62

                       $259,975,585 41
Deduct previous " appreciation " written off.... 2,366,109 55

   Total net assets November 10, 1922........ $257,609,475 86
which divided by 9,000,000, the shares out-
   standing after dividend, gives value per share... 28 62

The value of principal to be kept good is
   1920 × $43.00........ .................... $82,560 00

The shares now held are....................... 5,760.000
The number of shares of a value of $28.62 re-
   quired to keep principal intact is $82,560.00 /
   28.62.................................... 2,884.696

Which leaves shares distributable to life
   beneficiary............................... 2,875.304
And to remaindermen........................ 964.696

   Total shares......................... 3,840.000

*Humes, Buck & Smith*, for the plaintiff.

*Miller, Otis, Farr & Henderson*, for the defendant Ladd.

47

*Richard Ely,* for the defendants Macy and Lewis.

*Hoes, Low & Miller,* for the defendants Willets, Greer and Brown.

*Ernest P. Hoes,* for the infant defendants Willets.

*Henry C. Willcox,* for the defendant American Surety Company.

TAYLOR, J. The plaintiffs, substituted trustees of the trust created by the last will and testament of Josiah Macy, Jr., deceased, for the benefit of his daughter, the defendant Kate M. Ladd, bring this action for the judicial settlement of their accounts for the period from December 31, 1921, to December 31, 1923. The accounts are approved by all parties in interest, except in so far as such accounts evidence the award by the plaintiffs to Kate M. Ladd, the life beneficiary, of the entire amount of two stock dividends extraordinary in character, viz.:

(a) Four hundred per cent stock dividend of the Standard Oil Company of New Jersey, paid to stockholders of record November 25, 1922 — 78,400 shares at 39⅝; valuation, $3,106,600; and

(b) Two hundred per cent stock dividend of Standard Oil Company of New York, paid to stockholders of record December 1, 1922 — 3,840 shares at 47⅛; valuation, $180,960.

Acting upon the advice of counsel in making such awards, the plaintiffs submit the propriety thereof to the court. The life beneficiary contends that each award is legally correct. The remaindermen contend that in part only is it so correct, and that at least 18,798.583 shares of the 78,400 shares of the New Jersey company, and at least 965 of the 3,840 shares of the New York company, should be awarded to the principal of the trust. The principal contention of said defendants is that, to the extent that the stock dividends in question are representative of an appreciation in value (being the "write-ups" mentioned *infra*) of stocks of subsidiary companies held by the corporations declaring the dividends, the dividends must be treated as capital of the trust, however sound the revaluation of stocks of the subsidiary companies by the declaring companies may be, and to whatever extent such revaluation may be based upon accumulated and undistributed earnings of such subsidiary companies, and notwithstanding that the stocks of the subsidiary companies, except a negligible number thereof, were acquired by the parent corporation after the trust here involved was set up; and the same contention is made by the remaindermen, who insist that it is a valid contention, even though such stocks were acquired by the investment of the parent company's earnings. I gather, also, from the briefs of the counsel for the remaindermen that it is contended that, even if stocks

of subsidiaries so appreciated in value by the parent company were purchased from earnings of the latter, such stocks must be deemed capital of the parent by reason of claimed necessary legal implications from the rulings of our highest court in *Thayer* v. *Burr* (201 N. Y. 155). As to this case, note discussion *infra.*

Josiah Macy, Jr., died testate on October 5, 1876. There survived his widow, Caroline L. Macy, who died December 31, 1898, and also the following, his only heirs at law and next of kin, viz.: His daughter Mary K. M. Macy (afterwards Willets), who died in 1893; his daughter, the defendant Kate M. Ladd (then Macy); his son, the defendant (and also a plaintiff) Valentine Everit Macy, who was the testator's youngest child, and who attained his majority on March 23, 1892. The life beneficiary, Kate M. Ladd, and all persons in being having any interest in remainder, are now parties to this action. The will and codicil of the deceased were duly admitted to probate in the Surrogate's Court of New York county, and are set forth in full in the second amended complaint. The trust here involved, imposed upon the executors, whose successor trustees are plaintiffs herein, with other trusts not here material, was created by clause III of Josiah Macy, Jr.'s, will. In substance the will provides that, as to the share of the defendant Kate M. Ladd in the residue, the same is to be kept invested and the income to her paid during her life. At her death such share is to go to her lawful issue (if any), and in default of such issue in equal shares to her then living brothers and sisters, and to the lawful issue of such who shall have died leaving issue, such issue to take by representation the share which the parent, if living, would have taken. Mrs. Ladd is without issue; her brother, the plaintiff and defendant Valentine Everit Macy, survives, as well as the issue of Mrs. Willets. There is also issue of the defendant Valentine Everit Macy.

*Inter alia,* the testator directed his executors to leave undisturbed such investments as they might find already made by him, unless it should seem best for the estate to realize upon them. The investments ultimately resulting in the dividends here in question are in that category. The trust was set up as of March 23, 1892, when the defendant Valentine Everit Macy attained his majority. As part of the corpus thereof there were 7,424 shares of the so-called Standard Oil Trust, dissolution of which as an unlawful combination was directed by a judgment of the Supreme Court of Ohio on or about March 1, 1892. Sales from the said shares aggregating 2,524 were made from time to time before September 23, 1896. Then there remained 4,900 shares only. The facts in the case are in effect admitted as set forth in the answers of certain defend-

ant remaindermen, and, therefore, it appears that these 4,900 shares became, in 1911 and 1912, in the hands of the then trustees of the trust for Mrs. Ladd, 4,900 shares (par value $100) of the common stock of the Standard Oil Company of New Jersey. These were exchanged in 1922 for 19,600 shares of the same corporation (par value $25), and the same, constituting a part of the corpus of the trust here involved, are those upon which the 400 per cent stock dividend above referred to was declared. The plaintiffs also held in 1922, further as part of corpus, 1,920 shares (par value $25), originally 480 shares (par value $100), of the common stock of the Standard Oil Company of New York, the source of which may be traced in the said admitted facts. These are the shares upon which the 200 per cent stock dividend above referred to was declared.

The situation presented in the case at bar is one which, as far as the research by learned counsel and by myself is concerned, has never been passed upon directly by any court. I think, however, that opinions of our highest court in recent years have set forth the principles upon which a proper determination in the case at bar must rest. The law as I gather it from the authorities will be stated:

The fundamental guide to a proper award of such stock dividends as between life tenant and remainderman is the intention of the testator, to be gathered from the language of his will or from the situation surrounding its execution, where this is possible. (*Robertson* v. *de Brulatour*, 188 N. Y. 301, 305; opinion of the late Judge WALTER C. NOYES, as referee, in *Macy* v. *Ladd*, modified, though not on that point, 182 App. Div. 216; 227 N. Y. 670; *Lowry* v. *Farmers' Loan & Trust Co.*, 172 id. 137, 143.) Here there is nothing " in this will nor in the situation surrounding its execution which appears of especial significance." (Opinion of Judge NOYES in *Macy* v. *Ladd, supra.*)

Whether the testator's intention is expressed ambiguously, or, as in this case, indefinitely, resort must be had to the facts in order to discover whether the particular dividend was a distribution by the corporation of the accumulated earnings or profits, or of that which was capital. (*Lowry* v. *Farmers' Loan & Trust Co., supra,* 143; *Robertson* v. *de Brulatour, supra,* 305; *Matter of Osborne,* 209 N. Y. 450, 475; *Bourne* v. *Bourne,* 240 id. 172; Thomp. on Corp. [2d ed.] § 5414; *McLouth* v. *Hunt,* 154 N. Y. 179.) In the first instance, if the accumulated earnings came into existence after the trust was set up, under well-settled principles they would go to the life tenant, and in the second instance, being in effect a distribution of capital, they would go to the remainderman. Hence in this case the court must look into the real nature and substance

of the transactions resulting in the two extraordinary stock dividends here involved (*McLouth* v. *Hunt, supra*), in order that the true nature of each dividend may appear, and that a determination may be reached whether capital or an accumulation of profits on the capital is being divided thereby among the stockholders. (*Lowry* v. *Farmers' Loan & Trust Co., supra*.)

The mere adoption by the corporation of a resolution cannot change the accumulated earnings into capital, as between the life tenant and the remainderman (*McLouth* v. *Hunt, supra*); on the other hand, while the corporate action is not absolutely conclusive upon the court, if it is based upon the facts, and is not purely arbitrary, it will be given effect by the courts. (*Lowry* v. *Farmers' Loan & Trust Co., supra*.) Every one agrees that ordinary dividends, as distinguished from extraordinary ones, such as those here involved, go to a life beneficiary of a trust, regardless of the effect upon the corpus of the trust. (*Bourne* v. *Bourne, supra*.)

There is no dispute here as to the rule which must be followed in determining the rights of these parties, although the latter differ as to the result in this case of its proper application. Such rule is stated by Judge CHASE in *Matter of Osborne* (209 N. Y. 450, 477):

" Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

Sufficient of the dividend must be retained in the corpus to maintain the latter unimpaired and the balance of the dividend must be awarded to the life beneficiary. (*Matter of Osborne, supra,* 484, 485.) The rule which embodies the arithmetical calculations necessary to accomplish this result is laid down in detail in *Matter of Osborne* (*supra,* 484, 485), and concludes with the holding that market value, good will and like considerations cannot be considered in apportioning such a dividend. From the above it follows that the principle which must govern the decision of this case is that extraordinary dividends, payable from earnings of the company accumulated during the trust period, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund, as received from the testator or maker of the trust, or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund, or apportioned between that fund and the life

beneficiary in such a way as to preserve the integrity of the trust fund. (*Matter of Osborne, supra.*)

In this connection see my discussion *infra* as to possible capital increases, to which a life tenant has no right when dividends are declared therefrom. In order that the stock dividends here involved may be properly awarded in their entirety to the life beneficiary, it is clear that it must appear (a) that such dividends were paid from earnings accumulated as above indicated, or increment thereof, rather than from any increment legally attached to capital, of the declaring company; and (b) that they do not entrench at all upon the capital of the trust fund as the original trustees received it from the testator (*Id.*), plus, of course, such increment, if any, legally attaching to capital. In all cases of extraordinary dividends, either of money or stock, sufficient of the dividend must be retained in the corpus of the trust to maintain it unimpaired; the balance thereof must be awarded to the life beneficiary. (*Matter of Osborne, supra,* 484.) When there has been a division of the corporate property, no matter what form it may take, that part thereof which consists of profits or earnings (accumulations within the category aforesaid) belongs to the life tenant, and that which is capital to the remaindermen. (*United States Trust Co. of New York* v. *Heye,* 224 N. Y. 242; *Thayer* v. *Burr,* 201 id. 155.)

It is not the law, however, that so long as the principal of the trust fund is in no way depleted or lessened, all the subsequent increase in value must be categoried as income, whether distributed or not; for while the corpus of the fund may not be depleted, yet the corpus itself may accumulate or increase, and until there is some division in the nature of a dividend payable out of accumulated earnings, there is nothing that can be awarded as income to beneficiaries. (*United States Trust Co. of New York* v. *Heye, supra.*) The purpose of our highest court in its several decisions on the subject here involved is stated in a recent utterance (*Bourne* v. *Bourne,* 240 N. Y. 172, 175): " Our main purpose has been to preserve intact the capital of the trust estate, increased or decreased by any normal rise or fall in values, assigning to the life tenant but the income therefrom. Our decisions have been an attempt to enforce this purpose. And we do not, as we could not, always apply any one formula."

The court (*Id.*) then discusses stock dividends in their several phases: (a) Where the dividend has had for its object merely a change in the number of shares representing the proportional interest of stockholders in the capital and surplus. (b) Where the dividend is merely an issue to the stockholders of shares in subsidiary corporations formerly held by the parent, whose shares formed part

of the trust estate. In either of these instances the court stated
that it " had little difficulty in allotting such a dividend to the
remainderman." (c) Where the stock of the subsidiary had been
acquired by the parent from earnings of the latter made after the
trust was established, in which case the court has " allotted the
dividend to the life tenant." (Id.) (d) Where extraordinary
dividends have been declared in the form of shares issued to stock-
holders in order to accomplish capitalization of surplus profits, in
which case the court declares (Id.): " What we wish to do is clear.
These profits may have been made before the trust estate was
created. Or after. Or both before and after. Under the first and
second contingencies the cash or stock dividends go to the remain-
derman or to the life tenant respectively. Under the last they
should be divided between the two in the proportion that the
earnings before bear to the earnings after."

The life beneficiary may not share in accumulated corporate
earnings, however large, until and unless, through the medium of
dividends declared, such earnings by corporate action have been
transferred to the stockholders. (*United States Trust Co. of New
York* v. *Heye,* 181 App. Div. 544, 556; 224 N. Y. 242, 250, 253, 254.)
But, " when the accumulated profits come into the hands of the
trustees in any form or manner, the life tenant is entitled to receive
them." Quoted by Judge CRANE in *United States Trust Co. of
New York* v. *Heye* (224 N. Y. 254) and citing *Matter of Schaefer*
(178 App. Div. 117, 122; 222 N. Y. 533).

Further, the remaindermen are entitled to the benefit of any
accretion in value of the corpus of the trust which does not arise
from the application to capital purposes of earnings accruing after
the creation of the trust. (*United States Trust Co. of New York*
v. *Heye, supra.*) This truism is also to be noted in this connection:
The surplus of a corporation, in so far as it is not representative of
increase in value of capital assets, represents accumulated income.
As to the income, that portion which was earned prior to the creation
of the trust, added to the then capital stock, represents the book
value at that time; and income, which was reserved by the corpora-
tion during the period of the trust, if at any time or in any manner
the same is distributed to the stockholders, under plain principles,
should go to those who are entitled to the income derived from the
investment during the trust period. Whether the award by the
plaintiffs to the life beneficiary of the entire amount of the extraor-
dinary stock dividends here involved is legally correct, depends,
under the undisputed facts, upon the answer — which I will try
to make correctly — to the question whether such dividends,
respectively, " entrench in whole or in part upon the capital of the

trust fund as received from the testator  *  *  *  in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund." (*Matter of Osborne,* 209 N. Y. 450, 477.)  By " corpus " we mean, in the light of authority, the original principal of the trust, plus those increases which legally attach thereto.  (*United States Trust Co. of New York* v. *Heye, supra; Bourne* v. *Bourne, supra.*) If, in fact, there is no such entrenchment upon the corpus, the life beneficiary's right to the entire extraordinary stock dividend, in each case, follows.

In the first place, we must ascertain what is the book value of each of the 19,600 shares (par $25) constituting corpus of the trust fund as of March 23, 1892, when the trust fund was set up (*Matter of Osborne, supra,* 484 and 485), and we must add thereto the book value per share of the one or more increases which properly constitute increment of the fund, if there are any such increases.  (*United States Trust Co. of New York* v. *Heye, supra.*)  It is these values which in the aggregate must not be " entrenched upon."  The 4,900 certificates of " Standard Oil Trust " were originally capital of the trust fund.  The said " trust " on March 23, 1892, was composed of twenty corporations.  The names of these and their outstanding capital stock, respectively, are detailed in the answers of the defendants remaindermen.  All of such outstanding capital stock was held by the trustees of the said " trust " for the benefit of the certificate holders.  The shares of seventeen only of these twenty corporations were distributed in kind by the said last-mentioned trustees in 1911 and 1912, in accordance with the terms of a judgment entered in 1911, of the United States Circuit Court for the Eastern District of Missouri (examine also *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1, modifying and affirming 173 Fed. 177), and are not here involved.  The shares not distributed in kind were of three only of the said twenty corporations, namely:

| Name. | Total outstanding stock. |
|---|---|
| Forest Oil Company | $5,500,000 |
| Northwest Ohio Natural Gas Company | 3,278,500 |
| Standard Oil Company of New Jersey | 10,000,000 |

And the shares of these corporations constitute in the last analysis the corpus of the trust (*Matter of Osborne, supra*), which, with any increase thereof, must not be entrenched upon.  (*United States Trust Co. of New York* v. *Heye, supra.*)  The $10,000,000 capital

stock of the New Jersey Company, immediately above referred to, was subsequently converted into the same par value of the so-called " old preferred stock." This in turn (with the stocks of the other nineteen constituent corporations) was later taken in exchange for the present common stock of the Standard Oil Company of New Jersey, such " old preferred stock " being thereupon canceled. In 1892 the Standard Oil Trust certificates held by the Ladd trustees were exchanged for what were called " assignments of legal title." These " assignments " were surrendered by the Ladd trustees in 1898 and 1899, and they received then in exchange therefor the said Ladd trustees' proportionate share of the stocks of the twenty constituent companies. As above indicated, in relation to the shares so received of seventeen of these corporations, and so distributed in kind, the same, by reason of such distribution, may be here disregarded. (See *Macy* v. *Ladd*, 227 N. Y. 670.) The Ladd trustees received shares (not so distributed in kind) of the said other three constituent corporations, namely:

| Shares. | Name of corporation. |
|---|---|
| $277\frac{117500}{972500}$ | Forest Oil Company. |
| $165\frac{184000}{972500}$ | Northwest Ohio Natural Gas Company. |
| $503\frac{832500}{972500}$ | Standard Oil Company of New Jersey (" old preferred stock "). |

On June 16, 1899, the Standard Oil Company of New Jersey increased its capital stock from $10,000,000 to $110,000,000 (being $10,000,000 preferred, later retired, and $100,000,000 common). The former $10,000,000 common was converted, as above indicated, into the same amount of preferred (" old preferred "). Of the authorized $100,000,000 common, $97,249,200 (or 972,492 shares, at $100 a share) thereof was issued and used in the acquisition of the outstanding shares of the twenty constituent companies, including its own " old preferred stock." By this transaction the Ladd trustees on June 29, 1899, delivered to the Standard Oil Company of New Jersey their shares in the seventeen constituent companies, and also those in the other three constituent companies specially mentioned above, and received in exchange 4,900 shares (par value $100) of the Standard Oil Company of New Jersey. Such 4,900 shares constituted then, as well as on June 30, 1922, on which last-mentioned date they were in the form of 19,600 shares of the same corporation (par $25), corpus of the trust here involved. Therefore, the corpus now under discussion consists of such 4,900 shares of Standard Oil Company of New Jersey stock, so derived, as augmented, however, by such legal increment of corpus as may have attached. As above shown, these 4,900 shares were in turn represented by the shares of the said three corporations. The

life tenant asserts, and the remaindermen agree, that the book valuation of such corpus in the hands of the original trustees as of March 23, 1892, was as follows (answer, paragraph 30):

| Name of corporation. | Shares. | Value per share. | Total book value. |
|---|---|---|---|
| Forest Oil Company | $277\frac{1175000}{9725000}$ | $117 01 | $32,425 91 |
| Northwest Ohio Natural Gas Company | $165\frac{1840000}{9725000}$ | 122 12 | 20,172 90 |
| Standard Oil Company of New Jersey (" old pre-ferred stock ") | $503\frac{8325000}{9725000}$ | (agreed) | 74,212 46 |

Total value of corpus (4,900 shares, par $100) as of
    March 23, 1892 .................................... $126,811 27

On this basis the value of one share (par $100) is $\frac{1}{4900}$
    of said last-mentioned sum, or .................... $25 88

NOTE.— In arriving at the said book value of the New Jersey Company's " old preferred stock," I have adopted the method apparently agreed to by the parties, which takes into account the several dates of acquisition of the shares so aggregating 503 plus shares.

To this book value of corpus per share of $100 ....... $25 88
Concededly there is to be added the increase of corpus
    per share resulting from the exchange of Deutsche
    Americanische Petroleums Gesellschaft stock
    (answer, folios 82–91) ............................ 815

Making the total book value, plus such conceded
    corpus increase (at $100 par) .................... $26 695

On the present basis of $25 par, this equals... $6 674
To this must be added concededly the interest
    per share in book value resulting from the
    sale at a premium of certain common stock
    of the corporation, in 1921 ............... 18
And a like increase from like sales in 1922.... 234

Making a total value, per $25 share to be main-
    tained according to the concessions of the
    parties, of ............................. $7 088
Per share for 19,600 shares, constituting a total capital
    valuation not to be " entrenched upon " according
    to the life tenant (and from this the remaindermen
    dissent) in the sum of (19,600 × 7.088) ............ $138,924 80

All parties agree that at least said last-mentioned amounts (values per share and in toto) must be maintained as the valuation of the corpus. The life beneficiary asserts that the same are respectively the totals to be maintained; the remaindermen claim that certain further additions to corpus should be made according to law, very greatly increasing the said amount. Schedule A, annexed to this memorandum, gives the figures involved in their said claim.

It is conceded by all interested that the value of the said 19,600 shares of corpus, after giving effect to the increased outstanding capital due to the stock dividend of the New Jersey Company, is $35.56 per share of $25 par, or $696,976, a result which shows an increase and not an impairment of such corpus, if the value of the corpus and increases thereof to be maintained stand at only $138,924.80, or $7.088 per share; and if such valuation of corpus to be maintained is found to be correct, it justifies the award of the entire stock dividend of the New Jersey Company to the life beneficiary. (*Matter of Osborne, supra.*)

The claim of the remaindermen, however, is that the book value of a share to be kept good is not $7.088, but rather the much greater sum of $69.666 per share (See Schedule A), which latter sum, when compared with the conceded value of $35.56, after giving effect to the stock dividend, shows a substantial impairment of corpus per share, which the remaindermen assert should be made good by a proper apportionment of the 78,400 shares of the stock dividend between the remaindermen and the life tenant. The proportion claimed by the remaindermen is 18,798.583 shares thereof. Schedule B, annexed hereto, shows the figures involved in the remaindermen's said claim. Of the sum of $69.666 per share, value of corpus which it is claimed must be kept good, there is the considerable sum of $56.11, which is concededly the net amount of a " write-up " per share equal to such share's proportion of the accumulated earnings of subsidiaries of the New Jersey Company between 1906 and June 30, 1922, taken up in surplus of the parent company on June 30, 1922. The " write-up " is discussed more in detail later. The difference between this sum of $56.11 and said $69.666 amounts to $13.556 per share. (Schedule A.)

Such difference is constituted by the aforesaid sum of $7.088, the value per share to be maintained according to the life tenant, and $6.468 aggregate increases to corpus claimed by the remaindermen, exclusive of the said $56.11 alleged increase thereof due to the " write-up." (Schedule A.) If the said $56.11 is found to have the characteristics of income rather than of capital, and, therefore, is not properly included in the value of corpus per share to be main-

tained, that circumstance will dispose of the case in favor of the award of the entire stock dividend to the life tenant; for, in that event, the value of corpus to be maintained — according to the remaindermen's own figures, and accepting the same as in all respects correct — would be only $13.556 per $25 share, and, as shown, the conceded value of each of such shares, after giving effect to the stock dividend, is $35.56. Therefore we must look into the facts to ascertain the character of the " write-up " which is represented by $56.11 per share. That sum concededly represents so much of the " write-up " as accrues to each share of the 19,600 shares of corpus of the trust by reason of the net $223,265,515.46 " write-up " of stocks of various subsidiaries of the Standard Oil Company of New Jersey by the latter on June 30, 1922 — an amount which exactly equaled the aggregate then amount of the accumulated and undistributed earnings of the subsidiaries.

The inquiry must be directed to ascertaining whether the said sum of $56.11 has the characteristics of capital or income. If it is disallowed to corpus, the value to be maintained in corpus per share, according to the remaindermen, is only $13.556, and $35.56 more than maintains it. Also, if it is disallowed, the other increases of corpus (viz., 13.556 minus 7.088) claimed by the remaindermen and disputed, at least generally, by the life tenant's counsel, become immaterial to this discussion. (See Schedule B.) It is not disputed that the Standard Oil Company of New Jersey, holding stocks of its subsidiary corporations, had a custom which obtained prior to and until December 31, 1906, a custom abandoned then, and not obtaining again until 1922, of revaluing such stocks on its books. Such revaluations were based upon the book value of the stocks of subsidiaries as revealed by their respective balance sheets. For whatever reason, from December 31, 1906, until 1922, the said company continued to carry on its books subsidiary stocks at the valuation thereof as of December 31, 1906, except that, as to such stocks as were acquired after that day, the same were carried at cost.

In 1922 the New Jersey Company revalued, and, as all concede, properly, the stocks of its subsidiaries, and because thereof added to its then surplus the large net sum of $223,265,515.96, so constituting the appreciation in value of such stock. As indicated, all of this appreciation represented undistributed earnings of the subsidiaries in their aggregate. Certain adjustments brought the net addition to surplus in 1922 to the sum of $219,441,013.83, which amount, when added to the surplus before such revaluation, created a total surplus in excess of $600,000,000. In the same year the authorized common capital stock of the New Jersey Company was

increased from the sum of $100,000,000 to $625,000,000. From the then enormous surplus, and on December 20, 1922, a stock dividend of 400 per cent was duly paid out of such increased stock, representing, to the extent of the dividend, a capitalization of a part of such large surplus, which, however, the dividend did not exhaust; for on December 31, 1922, after the dividend, there remained, over and above the amount of the then common ($625,000,000) stock and the then preferred ($200,000,000) stock, a surplus of $209,140,608.08, which last-mentioned surplus is reflected in the conceded book value of each one of the 19,600 (par value $25) shares, after giving effect to the dividend, to wit, $35.56.

The preferred stock issues referred to consist of two, each in the sum of $100,000,000. The first was in 1919, and the second in 1920. Sufficient appears in the record to make it plain that, prior to 1919, extensions of plant and other features incident to the corporation's activities had been financed from the large earnings, but that, under the then existing conditions, the New Jersey Company's directors deemed it advisable not to continue such financing wholly from earnings, and further that they deemed it desirable that cash should be realized from such preferred stock issues for such corporate purposes (viz., the further development of the company's equipment and resources), which I think were essentially capital purposes, particularly in view of the announcements of the purpose thereof, which in each instance preceded the preferred stock issues. In such announcements there was no suggestion, in so many words, at least, that the proceeds thereof were to be used in the purchase of stocks of subsidiaries. From these two issues there resulted in cash $196,676,600, which was paid into the treasury of the company and placed with its general funds. It is conceded that no evidence in the case discloses exactly to what purpose the cash so received was in fact applied. I think, however, that the good faith of the directors must be presumed, and that it cannot be assumed that such cash was diverted from the essentially capital purposes indicated in the preliminary announcements, and there is evidence from which it is inferable that very large amounts were applied, in 1919 and 1920, to the very purposes mentioned in the announcements.

Having thus indicated generally the conceded facts preceding the extraordinary stock dividend of the New Jersey Company in 1922, I will discuss now those which appear in relation to the ownership by the New Jersey Company of stock of its forty-three subsidiaries, the net appreciation of the book value of which, on June 30, 1922, accounted for the large addition to surplus. The facts and figures connected with this " write-up " are set forth in paragraph 32 of the answer. Therefrom the following appears:

(a) That certain stocks of three subsidiaries — Gilbert & Barker Manufacturing Company, Underhay Oil Company and West India Oil Refining Company — were purchased in 1892, the year when this trust was set up. Such stocks are those so referred to specially as being negligible in the general result here, for, added to corpus per $25 share to be maintained, they increase that corpus by only $.631 per share. Further it appears (b) that certain stocks in two subsidiaries — Penn Lubricating Company and Standard Oil Company of Brazil — were purchased in 1895 and in 1896, respectively. As to these purchases they are likewise negligible in the general result, for the " write-up " additions to corpus per $25 share to be maintained would be, by reason of these two purchases, only $.654. Further it appears (e) that, except as to the stocks of the five subsidiaries just referred to, stocks of subsidiaries were all purchased during the period of 1901 to 1922. Further from undisputed facts it appears (1) that the New Jersey Company had a substantial surplus in 1892; that, even with the losses about to be mentioned taken from that surplus, the same was more than sufficient to purchase therefrom the stocks of the said five mentioned subsidiaries, which, as aforesaid, were actually purchased in 1892, 1895 and 1896; (2) that between 1893 and 1896, both inclusive, there were no net earnings of the company, taking the four years together. The showing was as follows:

| Year. | Deficit. | Profit. |
|---|---|---|
| 1893 | $14,550 94 | |
| 1894 | | $109,522 67 |
| 1895 | 1,105,701 41 | |
| 1896 | | 352,983 60 |
| Total | $1,120,252 35 | $462,506 27 |
| | 462,506 27 | |
| | $757,746 08, | net deficit for those four years. |

Therefore, the stocks of said five subsidiaries so purchased in 1892, 1895 and 1896 must have been and were purchased from earnings made before the trust was set up. Therefore, in so far as the " write-up " of such stocks is concerned, it attaches to corpus to be maintained; but, as above shown, the increases are too small to affect the general result here. The other stocks of subsidiaries were all purchased between 1901 and 1922 by the parent, at times when its financial condition as to surplus and earnings from year to year was such as to make necessary the legal inferences here that

such purchases were all made from earnings of the corporation accumulated during the trust period. Hence their appreciation in value by the " write-up " has the characteristics of income, because such stocks represent investments by the parent of the parent's funds, which, if they had been distributed as dividends, would have been allotted to the life tenant.

The shares so purchased from 1901 to 1922 were presumptively bought with money representing the earnings rather than the capital of the parent ( *United States Trust Co. of New York* v. *Heye,* 224 N. Y. 242, 261; *Macy* v. *Ladd,* 227 id. 670), and with earnings accumulated during the trust period. (Read in this connection *Sturgis* v. *Roche,* 217 App. Div. 573, 586.) If — as was not the fact — the shares of subsidiaries so purchased from earnings had been distributed in kind among the stockholders of the latter, they would have been awarded to the life beneficiary (*Bourne* v. *Bourne,* 240 N. Y. 172, 176; *United States Trust Co. of New York* v. *Heye,* 181 App. Div. 544, 561; *Williams* v. *Western Union Telegraph Co.,* 93 N. Y. 162, 191; *Equitable Life Assurance Society of United States* v. *Union Pacific R. R. Co.,* 212 id. 360; *Smith* v. *Dana,* 77 Conn. 543; 60 Atl. 117; *Macy* v. *Ladd, supra*); and the same result would have followed if the accumulated earnings of said subsidiaries had been distributed by them in dividends to the parent, and the latter had then declared dividends upon their holdings to these substituted trustees. Clearly in either of those events the last-mentioned dividends would have been awarded to the life beneficiary. The life tenant suggests that we disregard the form of the corporate entities and look at the substance of the situation. (See the language of CRANE, J., on the subject of unified control of parent and subsidiaries, in *United States Trust Co. of New York* v. *Heye,* 224 N. Y. 242, 250, and of SHEARN, J., in 181 App. Div. 544, 561.)

As above indicated, the stocks of the subsidiaries, except in the five negligible instances, represent earnings accumulated during the period of the trust. Such earnings so invested — and which could have been divided, but were not — were not placed beyond the reach of the directors of the parent company for dividend purposes; and, if they were capitalized at all, such earnings were not permanently capitalized and were available in 1922, with any increase in value thereof, for dividend purposes. (*Bourne* v. *Bourne,* 240 N.Y. 172; *Smith* v. *Dana, supra; United States Trust Co. of New York* v. *Heye,* 181 App. Div. 544, 560, and cases therein cited, some of which are cited *supra.*) The subsidiaries' stocks held by the New Jersey Company in 1922, representative as they were of earnings of that company made during the trust period, the net

" write-up " thereof had also, under very plain principles, the legal characteristics of earnings to which the life tenant, exclusive of the remaindermen, was entitled when the dividend in question was declared, if such dividend did not entrench upon the corpus of the trust, as I have shown it did not.

From all of the foregoing I conclude (a) that the stocks of subsidiaries held by the parent (New Jersey Company) were purchased from the parent's earnings accruing after the date when the trust was set up, viz., March 23, 1892 (except as to a negligible portion of said stocks); (b) that such investment of such earnings by the parent was not a permanent, and, indeed, to my mind, not any, capitalization thereof; (c) that the increase in value in 1922 of such stocks had the same characteristics as the said earnings of the parent with which such stocks were purchased; (d) that such investments and such appreciation in value thereof constituted legally a fund to which the life beneficiary was entitled when dividends were declared therefrom, in the absence of unlawful entrenchment upon the corpus of the trust. (*Matter of Osborne, supra.*) I determine further (e) that the aforesaid sum of $56.11 per $25 share, which is concededly represented by the net " write-up " in 1922 of the stocks of the subsidiaries, is not an increment to the corpus of the trust to be kept good. Therefore (f) the value of a $25 share of corpus to be maintained, disregarding as now immaterial the life tenant's general objection that $6.468 thereof is not increment attaching to corpus, is $13.556 per share, which is more than maintained by the conceded value ($35.56) after giving effect to the 400 per cent stock dividend of the New Jersey Company. The conclusion follows (g) that, as to the said extraordinary stock dividend here in question, the award of all of the 78,400 shares composing the same to the life tenant by the plaintiffs was legally correct, and I determine accordingly.

The views above expressed dispose of the case in favor of the life tenant. In view, however, of the learning and ability with which the counsel for the remaindermen have argued that the law of the State requires a different conclusion than that above reached, a brief discussion of certain of the contentions made by counsel for the remaindermen and a brief statement of my views thereon may be proper.

I. It is argued that a very large part of the stock of subsidiaries, appreciated in value in 1922 by the New Jersey Company, was the result of the investment by that corporation of its capital, not, however, of capital which it possessed when this trust was set up. The capital referred to consisted of the proceeds of the sale of issues of preferred stock in 1919 and 1920. The difficulty with this sug-

gestion is that it is admitted that it is impossible to trace the exact disposition of these proceeds, and further that the accumulated earnings of the company in each of the years of the said issues respectively, and thereafter until and including 1922, exceeded such purchases of stock in subsidiaries of said years, and still further that the announcements of the purposes of the preferred stock issues, which we must assume were made in good faith, did not suggest such investments in such stock, although they did suggest that the parent and its subsidiaries were one enterprise, and that the financing of subsidiaries had been had prior thereto from the parent's earnings — the abandonment of which practice it was suggested in the circulars, the necessities of the company's situation in 1919 and 1920 required.

The remaindermen claim, and the life tenant, as I gather from the briefs of counsel, agrees, that earnings prior to 1919 were invested by the New Jersey Company in stock of subsidiaries; but the remaindermen assert further that replacement of such earnings thus previously invested was accomplished by reason of the placing in the treasury of the company of the net proceeds of the preferred stock issues, a sum in excess of $196,000,000. Hence, the argument made that to a large extent subsidiary stock investments were of capital, that the " write-up " thereof had the legal characteristics of capital, and that, in so far as the " write-up " was reflected in the 400 per cent stock dividend, the remaindermen should receive it. This is another way of asserting that the sum of $56.11, alleged increment of corpus on the basis of a $25 share (See Schedule A), must be considered in the value of the corpus of the trust to be maintained. (*Matter of Osborne, supra.*) It is a fact that very large amounts of stock of subsidiaries were purchased after each of the preferred stock issues were sold; but, under all the circumstances disclosed in the record, I am compelled to determine that there is a reasonable presumption that such purchases were financed from the New Jersey Company's earnings (See opinion of CRANE, J., in *United States Trust Co. of New York* v. *Heye,* 224 N. Y. 242, 261) rather than from corpus, which included, in 1919, and again in 1920, the proceeds of the sale of such preferred stock.

Again, as militating against the remaindermen's contention, it is to be noted that the shares of subsidiaries figuring in the " write-up " were all purchased (with the negligible exceptions referred to) after the trust was set up. It is difficult, and indeed impossible, to discern in such shares the legal characteristics of corpus of the trust which is required in law to be maintained for the benefit of remaindermen. Further this " write-up," in the last analysis, is concededly

48

appreciation of value of such subsidiary stocks caused by *earnings* of subsidiaries. To be sure, these were earnings accumulated and undistributed, and, therefore, earnings the legal title to which was not in the parent company because of the fact of their non-distribution and well-settled law applicable to that fact.

I think, however, that in the interest of substantial justice, and in this case, where equity ought to be and must be done, we should cast aside the mere form of the separate corporate entities, which legally the parent corporation and its said subsidiaries present to us, and view these earnings of the subsidiaries as just that which in substance they are, earnings of the parent through the subsidiaries. Such corporations constitute one business enterprise, as vast as it is successful. Judges of the higher courts have recognized the unified control just referred to. Mr. Justice SHEARN (*United States Trust Co. of New York* v. *Heye*, 181 App. Div. 544, 561), speaking of this company as it was prior to 1911, said: " The properties were a part of its working plant in a business which, notwithstanding the preservation of the corporate identity of all these various companies, was conducted as a unified business under a common control and for the benefit of the Standard Oil Company of New Jersey."

In his opinion in the same case, in our highest court, Judge CRANE, referring to the same situation, said (224 N. Y. 242, 250): " While the individuality of each of the corporations was maintained and its business transactions kept separate and distinct, yet the Standard Oil Company (New Jersey) and its various subsidiary corporations constituted but one business, all the funds being employed and utilized for the furtherance and development of the organization. The business * * * was carried on by the Standard Oil Company (New Jersey) through these various corporations."

No one can read the record in the present case, which includes the announcements preceding the preferred stock issues, without receiving the conviction that the " unified control," of which these judges last mentioned wrote and commented upon, existed from 1911 to 1922 in the case of this parent company and its subsidiaries. In no aspect of the instant case is the " write-up " in question an increment of corpus. Both reason and authority, in so far as authority exists, stamp it with the legal characteristics of income. I admit that diligent research has disclosed no reported case which has expressly so held in relation to this " write-up." There is, indeed, the unreported opinion of a learned referee in the so-called *Pratt* case, mentioned in the several briefs, in which case the judgment in which was never reviewed upon appeal, the learned referee finds that the said " write-up " is legally an increment of corpus

to the benefit of remaindermen, as against the life tenant of such a trust as is here involved. Many of the referee's observations in his learned opinion, which I have read carefully, seem to me to lead logically to a result contrary to that arrived at by him. I am, of course, respectful of his said learned opinion, but it lacks the authority which an appellate opinion indorsing the referee's views would have. It is at variance with my own views, which I have as a result of careful consideration and study, and for these reasons I do not follow the learned referee.

II. The remaindermen also predicate upon *Thayer* v. *Burr* (201 N. Y. 155), a learned and ingenious argument to the effect that accumulated earnings of the parent corporation, invested in stock of subsidiaries, become so capitalized as to result in a legal increment ($56.11 per share aforesaid) of this trust's corpus. I do not think that anything in the opinion in the case cited, or therefrom inferable, gives validity to such argument; in fact, in the opinion in the case cited there is express language which, in my opinion, invalidates the remaindermen's said argument. In the case cited the trustee held stock in the Adams Express Company. The trustee received bonds and scrip in the nature of a dividend representing in part earnings and in part a (stipulated) increase in the value of certain investments made by the corporation. It was there held (a) that the life tenant was entitled only to that portion of the bonds and scrip which represented earnings; and (b) that the portion which represented (stipulated) increased value of securities held by the corporation, was a distribution of capital and belonged to the remaindermen.

As I read the record and the opinion in the *Thayer* case, it appears to me as if what was practically earnings of the corporation in an invested form was stipulated to be capital — a stipulation contrary to law, as I view the law. In the *Thayer* case the court pointed out (201 N. Y. 157): (1) That when the trust came into being the assets of the corporation amounted to $14,050,000; (2) that when the last distribution of bonds was made its assets were $40,800,000; (3) that the difference between these sums is $26,750,000; and (4) that the total distribution of bonds to stockholders was $24,000,000. The court held (201 N. Y. 157): " On this statement the amount distributed did not equal the amount of the earnings during the trust period *but the result is modified* [italics ours] by the stipulated fact that in the valuation of the assets at the termination of the trust $7,000,000 represented, not earnings, but simply the increased or enhanced market value of the securities held by the company."

A learned counsel for the remaindermen here in his zeal asserts that the record in the *Thayer* case shows that in fact the investments

were of earnings, and then argues that the Court of Appeals has in effect held in the case cited that earnings of a corporation, invested in securities become permanently capitalized, and that the increase in value of such investments is legally an increment of capital.   I respectfully differ with him.   There is a plain intimation in the language of the court that " the result is modified by the stipulated fact " referred to.   The " result " so modified, in the mind of the court, was undoubtedly that all of that distribution, which was of corporate earnings accumulated during the trust period, really belonged to the life tenant.   The stipulated fact, rather than any change in well-established legal principles, accounts for the court's determination in the *Thayer* case.

The counsel for the remaindermen here argues that, if it is conceded that all the investments by the New Jersey Company in stocks of its subsidiaries since 1892 were of its earnings accumulated during the trust period, such investments constitute capital of the corporation, and that increase in value thereof is capital, to the remaindermen's benefit and the life tenant's detriment.   I think that the mere statement of the proposition demonstrates its fallacy, and I believe and hold that no such proposition was even by implication laid down in the *Thayer* case.   Clearly, if the subsidiaries' stock represented, as I have found that it did, investments of accumulated earnings of the parent during the trust period, when and if the surplus represented by such investments and any increase in value thereof was distributed in an extraordinary dividend declared as here, such dividend would be allotted to the life tenant, if there was not entrenchment upon the corpus of the trust; and as above indicated, there was not such entrenchment here.

The learned arguments of all counsel, whether oral or submitted in the splendid briefs which have been filed, have been carefully considered by me, even if all of such arguments are not specifically referred to in this memorandum.   In my opinion, no contention made, however learnedly urged, militates against the legal validity of my views as above expressed, upon the undisputed facts in the case at bar.

It is urged that such a result gives benefits to the life tenant so out of proportion to the benefits to remaindermen that the testator, whose will was probated in 1876, could not have intended what will accrue from this decision to the life tenant.   If the testator could have foreseen the remarkable financial success of the great Standard Oil enterprise in the years which intervened between the time of his death and 1922, it may be that he would have made a will more favorable in its terms to those here remaindermen.   But we may not read into the document anything which he did not write therein.

The will gives to this daughter, Mrs. Kate M. Ladd, " the interest and income " of the share constituting the corpus of this trust for her life. It is of no legal moment that such income has been great and will be made so much greater by this determination, for, presumptively, such income, however large, was within the testator's contemplation when he provided for his said daughter.

The discussion thus far has been devoted in the main to the New Jersey Company's 400 per cent stock dividend. The application of the same principles of law leads to the confirmation of the award by the plaintiffs to the defendant life tenant of the entire amount of the 200 per cent stock dividend of the Standard Oil Company of New York.

It has appeared already in this memorandum that prior to December 22, 1922, the trustees held as corpus of the trust for Mrs. Ladd 1,920 shares (par value $25) of the stock of the New York Company. On December 22, 1922, the plaintiff trustees received 3,840 additional shares (par value $25), representing an extraordinary stock dividend of 200 per cent. All of these the plaintiffs awarded to the life tenant. They claim that in so doing, after giving effect to the increased outstanding capital due to the stock dividend, they did not impair, and that there was no detrimental effect upon, the value of corpus of the trust to be maintained, as far as the 1,920 shares of the New York Company were concerned. The life tenant claims that the trustees' said award is legally correct. The remaindermen assert that it is incorrect to the extent of at least 965 shares thereof, which the remaindermen assert should have been awarded to the corpus of the trust.

The history of the New York Company, as far as is material, is as follows:

The New York Company was the owner of certain shares of Magnolia Petroleum Company, organized in 1911, with an authorized capital of $60,000,000. This was increased in 1920 to $120,000,-000, and again in 1922 to $180,000,000. In 1918, the New York Company acquired 198,000 shares of the Magnolia stock; subsequently and prior to December, 1920, it acquired additional shares. In 1920, upon the occasion of the aforesaid increase of capital stock of Magnolia to $120,000,000, the New York Company owned $40,400,000 par value of Magnolia stock. The increase of the Magnolia Company's capital, just mentioned, was in the nature of a stock dividend, because the New York Company, in 1920, received 404,000 additional shares, making a total of $80,800,000 par value, of the total authorized capital of $120,000,000. The original $40,400,000 par value of Magnolia stock was carried on the books of the New York Company at $33,327,239.51. When the said

stock dividend was received by it in 1920, the New York Company failed to add anything to the book value of its holdings of Magnolia stock, but the then entire $80,800,000 was carried on the books at the same figure as the original $40,400,000 of Magnolia stock, namely, $33,327,239.51. On October 31, 1922, the New York Company appreciated the value of the original $40,400,000 of Magnolia stock on its books, from $33,327,239.51, to the par value thereof, to wit, $40,400,000. At the same time it valued the stock dividend received from the Magnolia Company in 1920, at the same price, viz., $40,400,000.

By these processes the total $80,800,000 of Magnolia stock was carried on the books of the New York Company at par, $80,800,000. Between October 31, 1922, and December 4, 1922, the New York Company acquired 17,218 additional shares of Magnolia (aggregate par value $1,721,800), paying, however, the larger sum of $1,929,920 for these additional shares, which it carried on its books, however, only at par, namely, $1,721,800. On and after December 4, 1922, the New York Company's total holdings of Magnolia stock were $82,521,800 aggregate par value, and on December 4, 1922, the Magnolia Company declared a fifty per cent stock dividend, by which the New York Company acquired 412,609 additional shares of Magnolia, which it carried on its books at par value. This last-mentioned fifty per cent stock dividend was paid December 15, 1922, so that the total holdings of the New York Company in Magnolia, as of December 31, 1922, were of the aggregate par value of $123,782,700, which were carried on the books at that last-mentioned figure. On or about November 10, 1922, the New York Company voted to increase its capital from $75,000,000 to $225,000,000, and on the same day the board of directors declared a stock dividend of 200 per cent, payable December 20, 1922, to stockholders of record as of December 1, 1922. This is the dividend here in question.

The claim of the remaindermen to the effect that 965 shares of the stock dividend now under discussion should be awarded to corpus is, as to the figures involved therein, set forth in Schedule C annexed to this memorandum. The following figures are determining ones, which I take from the life tenant's brief, as illustrating the apportionment which it is claimed should be made of this stock dividend between corpus and life beneficiary:

The book value per share of the shares held for
   principal prior to the dividend of November 10,
   1922, the integrity of which must be maintained,
   is agreed to be..............................     $108 71
This is equivalent, at $25 par, to...............     27 18

During 1922, prior to November 10, the value at
which the Magnolia Petroleum stock was carried
on the books of the Standard Oil Company of
New York was increased by...................$47,472,760 49
Since there were then 3,000,000 shares outstanding,
this resulted in an increase in the book value per
share of..................................       15 82
Adding this to the book value, the integrity of
which must be maintained as above, the book
value to be kept good per share, as claimed by the
remaindermen, is...........................       .43 00
The book value per share, November 10, 1922, after
the 200 per cent stock dividend, is agreed to have
been......................................       28 62
The claimed value of the principal to be kept good
is 1920 shares at $43 .....................    82,560 00
The shares now held are:
  Original corpus.................. 1,920
  Stock dividend.................. 3,840
                  —— 5,760

The number of shares, of the value of $28.62, re-
quired to keep principal intact, is 82,560/28.62..   2,884.696
Which leaves shares distributable to life beneficiary.   2,875.304
And shares to be added to corpus of the trust,
3,840 — 2,875.304............................     964.696

The above " write-up " of $47,472,760.49, and its disposition as
increment of corpus or of income, determines the question as to how
the stock dividend should be apportioned, if at all, because, if this
amount is disallowed to corpus of the trust, the value to be kept
good is, as above, $28.62 per share, which value more than main-
tains the value to be kept good as above, to wit, $27.18 per share,
and in the same event the propriety of the award of the entire stock
dividend to the life tenant, there being no entrenchment upon
corpus to be maintained, would follow.  As above indicated, the
principles discussed in the case of the New Jersey Company control.
The only practical difference between the situation presented in
the case of the New Jersey Company and that of the New York
Company is that the " write-up " of subsidiary stock of the former
was to the book value of the stock, in which was reflected only
accumulated and undistributed earnings of subsidiaries, and in the
latter case the " write-up " was to the par value of the stock held
by the New York Company.  The record shows that the first

shares of Magnolia were acquired by the New York Company on or about February 1, 1918, and that between this date and June 30, 1920, in all 404,000 shares, of the par value of $40,400,000, were purchased for the aggregate sum of $33,327,239.51, a sum which was less than the surplus earnings of the New York Company accumulated between 1913 and February 1, 1918.

Because of the principles adverted to in the discussion herein relating to the New Jersey Company, it follows that the shares purchased between 1918 and 1920, from earnings which had been accumulated long after the creation of the trust, in excess of the amount of the purchase, are presumptively investments of earnings (*United States Trust Co. of New York* v. *Heye, supra*); that such invested earnings and any increment in value thereof do not, for the reasons indicated in the case of the New Jersey Company herein, become or form part of the corpus of the trust. The " write-up " or appreciation, to the extent of $47,472,760.49, involved two blocks of stock. These were (a) original purchases; and (b) a stock dividend thereon, declared by the Magnolia Company, of 100 per cent, payable December 28, 1920, which was taken up at par on the books of the New York Company on October 31, 1922.

The following are the figures:

| | | |
|---|---:|---:|
| 404,000 shares cost............................ | $33,327,239 | 51 |
| The appreciation thereon to par ($40,400,000) is. | 7,072,760 | 49 |
| 100 per cent stock dividend of the Magnolia Company at par............................... | 40,400,000 | 00 |
| Total................................... | $80,800,000 | 00 |

It is readily seen that, if the total appreciation involved in the two figures ($7,072,760.49 and $40,400,000), namely, $47,472,760.49, is disallowed to surplus, the award of the entire stock dividend to the life tenant by the trustees is justified, because in such event, as above indicated, the value necessary to be maintained per share of corpus, is maintained. I determine that in this case, as I determined in the case of the New Jersey Company, as the original shares of Magnolia were purchased out of earnings accumulated after the creation of the trust, they do not form part of the corpus of the trust and that a stock dividend declared from the same property goes to the life tenant.

It is to be noted that no question is raised as to the propriety of the appreciation in value of the Magnolia stocks, by the New York Company's directors, and at all events this is a matter largely within the control and discretion of the directors. (See *Bourne* v. *Bourne, supra*.) If the directors act in good faith, in the exercise

of business judgment, the courts will not question their determinations in this regard. (*Bourne* v. *Bourne, supra.*) Here, whatever else is the subject of contention, it is conceded that the appreciation in values of the Magnolia stocks was justified.

In closing, I express to all counsel involved my appreciation of the co-operation which they have extended to me in their endeavor to assist me in arriving at a proper determination in this important case. To a certain extent I feel that I have taken the advanced ground which the life tenant and the plaintiffs suggested I should take in relation to these " write-ups," which, as far as I know, have not been passed upon, except, perhaps, in principle, by any adjudicated case. I hope that I have determined correctly. The case is of such importance to the parties that the *status quo* should be maintained until higher authority reviews this determination.

Judgment is directed in favor of the plaintiffs and against the defendants, in effect, as follows:

(a) Overruling the objections of the defendants remaindermen, asserted in their answers and otherwise herein, to the award of the entire stock dividend of the Standard Oil Company of New Jersey, to wit, 78,400 shares, and of the entire stock dividend of the Standard Oil Company of New York, to wit, 3,840 shares, to the life tenant, the defendant Ladd.

(b) Confirming such award in each instance by the plaintiff trustees to the life tenant.

(c) Judicially settling, approving and allowing the account of the plaintiffs' proceedings as trustees, from December 31, 1921, to December 31, 1923, in the form and to the effect set forth in the exhibit attached to the plaintiffs' amended complaint herein.

(d) Judicially approving and confirming all the acts and proceedings of the said plaintiff trustees in the administration of the said trust from December 31, 1921, to December 31, 1923.

The decree to be entered hereon will also provide for and determine the costs to the attorneys for the several parties, and also extra allowances to the extent permitted by law, and the just compensation of the guardian *ad litem* of the infant defendants, remaindermen, will likewise be fixed, and appropriate directions for the payment of all thereof will be made in said decree.

Settle decision and judgment on notice. I will retain all papers at my chambers in Mt. Vernon, pending the settlement of such decision and judgment.